ROBERT J. WALLACE v. STATE OF NEBRASKA.

FILED APRIL 8, 1912. No. 17,452.

1. **Larceny: EVIDENCE.** Evidence examined, its substance stated in the opinion, and *held* insufficient to sustain a conviction of the crime of larceny as charged in the information.

2. **Criminal Law: STATUTE: CONSTITUTIONALITY.** The act of the legislature of 1911, defining the crime of hog stealing, and known as section 117*b* of the criminal code, is an act complete in itself. It was not intended to, and did not, amend sections 114 and 119 of the criminal code. Its purpose was to create an independent substantive crime and provide a penalty therefor, and is not violative of any of the provisions of the constitution of this state.

3. ————: **INDETERMINATE SENTENCE ACT: VALIDITY.** Chapter 184, laws 1911, commonly called the "Indeterminate Sentence Law," is not vulnerable to the objection that it vests the prison board with judicial powers. It is not in conflict with the provisions of section 26, art. V of the constitution, and is a valid exercise of legislative power.

4. ————: **INSTRUCTIONS: WEIGHT OF EVIDENCE.** When a defendant

in a criminal prosecution becomes a witness in his own behalf, it is not error for the court to instruct the jury that in considering his testimony they may weigh it as they would the testimony of any other witness, taking into consideration his interest in the result of the trial, his manner, and the probability or improbability of his testimony, and give to it such weight as under all of the circumstances they think it is entitled to.

ERROR to the district court for Buffalo county: BRUNO O. HOSTETLER, JUDGE. *Reversed.*

*H. M. Sinclair* and *W. D. Oldham,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

BARNES, J.

At the December, 1911, term of the district court for Buffalo county Robert J. Wallace, hereafter called the defendant, was convicted of the crime of hog stealing, and was sentenced to the penitentiary for a period of not less than one year, nor more than five years, "as shall hereafter be determined by the prison board." To reverse that judgment the defendant has prosecuted error.

His assignments are: First, the verdict of the jury is not sustained by the evidence; second, the sentence of the court is contrary to law; third, the sentence of the court by reason of its being indefinite in time of duration is a violation of the constitution of this state and is unauthorized by law, especially that part of the judgment of the court which leaves the "prison board" to determine the duration of the imprisonment is obnoxious to the constitution of this state; fourth, certain errors in the instructions of the court given by it on its own motion. The assignments will be considered in the order stated.

1. As to the sufficiency of the evidence to sustain the verdict, it may be said that the hogs alleged to have been stolen, and which were found in the defendant's possession, were identified and shown to have been the property of

the complaining witness beyond a reasonable doubt. However, it is strenuously argued that the evidence fails to show any felonious intent on the part of the defendant in taking them into his possession. On the trial the defendant testified in his own behalf, in substance, that he resided about 5½ or 6 miles northeast of the village of Amherst; that his business was farming; that his father, on the 12th day of August, 1911, lived in the west part of Amherst; that his father had some hogs, as he expressed it, "I expect between 40 and 45, big and little;" that he went to Amherst on that day, the 12th of August, and arrived there about half past 2 o'clock; went right to his father's place and unhitched his horses and put them in the stable; went into the house and got dinner; that he wanted to get some shelled corn of his father; that he put the sacks in the wagon and then went over to town; that he met his father in town, about 6 o'clock in the afternoon; that they visited around town a while before they went home; that they got home about 6 o'clock; that after they got home his father called his attention to some shoats there. He said they must be the Graham hogs; he was expecting the Graham hogs, and he says you can take them if you still want hogs, as he had bought them from my brother George. He said the hogs were large enough and thrifty enough to be worth $4 apiece, and he would take them at that price and he gave me his chance. I got the sacks ready because I was going to lodge—got the sacks ready; when I got back from lodge it would be too late to find them, and I got the sacks ready and I pulled the door down on the pig pen and closed the pigs in. The hogs were in the yard. We looked at them. I got the sacks ready and put the pigs in so they would not get away, for I had agreed to take the pigs if the price was all right. Then I went in to supper. We got our supper, and by that time it was 8 o'clock. As I was one of the officers of the lodge I wanted to be there just about 8 o'clock. The lodge adjourned about 25 minutes past 10. When I got to my father's house I loaded the hogs

right about then. I put the hogs in the sacks and went in and had lunch, hitched up and went home.' I was thinking it was the Graham pigs. "Q. At the time you took those pigs did you think they belonged to Mr. Patterson? A. No, sir; I did not know a thing about it. Q. Whose pigs did you think they were? A. I labored under the impression they were the pigs that were to be delivered that George had bought or traded for from Mr. Graham. Q. Did you intend to steal any one's pigs? A. No, sir; I never intended to, and never want to do anything like that." The defendant's father testified in his behalf. He stated that he had 50 or 60 hogs in the lot on August 12, nine old hogs and the rest spring pigs. He said in substance: I told Robert there were some pigs there running through the yard that George delivered, and he was talking about the hogs and he took them home, and we would settle on the price. I think they were George Wallace's hogs. I did not know what time Robert got the hogs, did not help him. Did not see Patterson that night. On cross-examination by the county attorney the witness made some contradictory statements, but none of them were so inconsistent as to destroy his evidence in chief. The defendant further testified that after they came home his father called his attention to the shoats. He said they must be the Graham hogs. He said he had bought them from George. He said the hogs were large enough and thrifty enough to be worth $4 apiece, and he would take them at that price, and he gave me his chance; had the conversation with father when we came into the yard. The hogs were running around in the yard; he said he supposed that was the Graham hogs; don't recollect that one was a cripple.

Patterson, the complaining witness, testified that he saw Robert Wallace and his father, James, on August 12, driving two red hogs out of the cornfield at James' place near Amherst; that he tried to count his hogs that night, but failed; that he counted them in the morning, they were seven short; that he found the hogs at Robert Wal-

lace's place; five had their tails cut off. He (Robert) said he bought the hogs of his father; afterwards he said his father told him there were some hogs, and he could take them; that he took them between 12 and 2 o'clock that night. The county attorney asked Robert if his father gave him the hogs, and he said yes; that Jim Wallace had about 25 hogs, all black, except four red, but they were not like "mine." Wagner, the constable, testified that the defendant said he had bought the hogs, and then that he and his father bought them together. Witness Higgins testified that defendant said he bought them. He told Patterson that if he said they were his hogs they might be. He was willing to turn them over because he did not know where his father got them. When asked how he came into possession of the hogs belonging to Patterson, he said his father gave them to him. George Wallace, who testified for the defendant, stated that he had traded with Graham for four shoats; that they were to be delivered on the day the hogs were taken, but were not delivered until about a week later. It appears that the Graham hogs, when delivered, were black, and there were only four of them, while the hogs in question were red.

The state contends that, because of the contradictory statements made by the defendant and his witnesses, the jury might have reasonably concluded that, when the hogs were taken, defendant and his father intended to deprive the complaining witness of his property, and that Robert expected to convert them to his own use. We are of opinion, however, that the evidence is insufficient to sustain the verdict. In order to convict the defendant of the crime of larceny, as charged in the information, the state was required to prove, beyond a reasonable doubt, that defendant participated in the larcenous taking of the hogs in question from the complaining witness. We think the evidence was insufficient to establish that fact beyond a reasonable doubt. Having reached this conclusion, we could well decline to consider the other questions argued

by counsel for the defendant; but, in view of the fact that they have been ably presented, we deem it best to determine them.

2. It is next contended that the act of the legislature declaring hog stealing a felony, without regard to value, is repugnant to the constitution. The act in question appears in the criminal code as section 117b. It provides: "If any person or persons shall steal any sow, barrow, boar or pig of any value, * * * every such person so offending shall be imprisoned in the penitentiary not more than five nor less than one year and shall pay the cost of the prosecution." We have omitted the provisions of the section relating to receiving such property, because that question is not presented by the record. It is argued that this classification has nothing for its basis; that there is no good reason why the theft of a hog worth one cent should be made a felony, and a theft of $34.99 of money be a misdemeanor only. This argument was disposed of by the opinion in *Granger v. State,* 52 Neb. 352. That action involved the constitutionality of the cattle stealing law, an act similar to the one here in question. It was there said: "It is suggested in the brief that this 'act is a vicious one, and possesses no point whereby it impresses the court to uphold it.' We cannot yield assent to the proposition; nevertheless, if it be true that the law is not a wise one, it is no reason why the courts should declare it invalid. The argument made by counsel against the statute under consideration would have been more appropriate were it addressed to the lawmaking body, as the constitution has not conferred upon this court the power to repeal laws, but the authority to interpret and enforce them in proper cases." *Ream v. State,* 52 Neb. 727; *State v. Arnold,* 31 Neb. 75.

It is further argued that the law is unconstitutional because the defendant might have been prosecuted under the provisions of section 119 or of section 114 of the criminal code as well as section 117b upon which the prosecution was based, and therefore the state had the

power of election, and that such power renders the act obnoxious in that it destroys the uniform operation of the law. We cannot give our assent to this contention. By section 117*b* hog stealing is made a definite and substantive crime. The information on which the defendant was prosecuted charged him with a violation of that section, and in order to warrant a conviction the state was required to produce testimony establishing the commission of that offense. The effect of section 117*b* was to eliminate the offense of hog stealing from the provisions of sections 114 and 119 of the criminal code, and compel the state to prosecute, if at all, under the provisions of that section. It follows that there was no right of election, and this contention must fail.

3. It is further contended that the act in question operates as an amendment to sections 114 and 119 of the criminal code; that amendments are not mentioned in the title, and therefore the act is violative of the provisions of section 11, art. III of the constitution. That question is disposed of in *State v. Arnold, supra,* where it was said: "The act entitled 'an act defining the crime of larceny from the person and providing a penalty therefor,' approved March 14, 1887, was not, nor was it intended to be, an amendment of section 114, or section 119, of the criminal code, or of any statute then in force. Its purpose was to define a new crime and provide a penalty therefor. It is not inimical to the provisions of section 11, art. III of the constitution of this state."

4. Defendant also contends that "the sentence of the court by reason of its indefiniteness in duration is violative of the constitution of the state, and is unauthorized by law, especially that part of the judgment of the court which leaves the 'prison board' to determine the duration of the imprisonment is obnoxious to the constitution." Various reasons are assigned in support of this contention, and if this were a case of first impression we might be inclined to adopt defendant's view of it. We find, however, that in a number of our sister states what is

called an indeterminate sentence law has been adopted and the courts of these states have uniformly sustained the constitutionality of those acts. The constitution of the state of Illinois is similar to our own, and the legislature of that state passed an act very like the one in question in this case. The constitutionality of that act was challenged in *People v. Joyce*, 246 Ill. 124. There all of the objections to the constitutionality of that act were urged that are now presented in the case at bar. It was there said: "The powers granted to the board of pardons by the parole act of 1899 are not judicial in character but are matters of prison discipline, to be exercised for the benefit of offenders imprisoned in state institutions. The parole act of 1899 is not an interference with the functions of the court, but is rather the exercise, through the legislative and administrative departments of the government, of the power of discipline which the state possesses, and is not unconstitutional as conferring judicial power upon administrative officers. The provisions of the parole act of 1899 with reference to the final discharge of a paroled prisoner are not invalid, as infringing the constitutional right of the governor to grant pardons and reprieves and commute sentences. The sentence of a convicted person under the parole act of 1899 is not a matter of discretion with the court, but is for the maximum term provided by law, and is therefore not indefinite and uncertain. The right of a convicted person to have the court fix his punishment is not a fundamental right, and the fact that the parole act of 1899 does not secure that right to a convicted person does not render the act invalid, as repugnant to the constitutional provision concerning due process of law."

The decision in that case was followed and approved in *People v. Roth*, 249 Ill. 532. A like act of the legislature of Kentucky was upheld in *Berry v. Commonwealth*, 141 Ky. 422. To the same effect are *State v. Ferguson*, 149 Ia. 476; *Palmer v. State*, 168 Ala. 124, 53 So. 283; *George v. Lillard*, 106 Ky. 820. We think that the foregoing sufficiently disposes of this question.

Finally, it is contended that the district court erred in giving the jury the following instruction: "You are instructed that under the laws of this state the accused is a competent witness in his own behalf and you are bound to consider his testimony; but, in determining the weight to be given to his testimony, you may weigh it as you would the testimony of any other witness, and you may take into consideration his interest in the result of the trial, his manner, and the probability or improbability of his testimony, and give to his testimony such weight as under all the circumstances you think it entitled to." It is argued that this instruction carries the insinuation that, while the accused is permitted to testify, his interest in the result of the suit destroys the force of his testimony. This court has refused to declare this instruction erroneous, in *St. Louis v. State*, 8 Neb. 405; *Davis v. State*, 31 Neb. 247; *Johnson v. State*, 34 Neb. 257; *Housh v. State*, 43 Neb. 163; *Philamalee v. State*, 58 Neb. 320; *Palmer v. State*, 70 Neb. 136. Opposed to these decisions counsel for defendant cite *Clark v. State*, 32 Neb. 246. It appears, however, that the vice of the instruction in that case was a too frequent repetition by the court that the jury, in weighing the defendant's testimony, might consider his interest in the result of the suit. It was there held that the trial court cannot, by repeating this statement, give it undue weight, or say aught calculated to disparage the testimony of the accused. The instruction complained of in the case at bar is not tainted with that vice.

For the reason that the evidence does not sustain the verdict, the judgment of the district court is reversed and the cause is remanded for further proceedings.

REVERSED.