LLOYD CHENEY, v. STATE OF NEBRASKA.

FILED JULY 3, 1917. No. 19944.

1. **Larceny:** SUFFICIENCY OF EVIDENCE. Evidence examined, its substance stated in the opinion, and the same *held* insufficient to sustain a conviction of the crime of cattle stealing as charged in the information.

2. **Criminal Law:** EVIDENCE: CONFESSION. A statement of facts claimed by the prosecution to be equivalent to a confession of guilt will not be considered unless it is first shown to have been voluntarily made and without inducement. *Jones v. State,* 97 Neb. 151.

3. **Larceny:** PROOF. In order to convict the defendant of the crime of cattle stealing, the state must prove beyond a reasonable doubt that the defendant participated in a larcenous taking of the property with the intent to convert the same to his own use.

4. ———: INTENT. A felonious intent to convert the stolen property to the defendant's own use is a necessary element of larceny.

ERROR to the district court for Sioux county: WILLIAM H. WESTOVER, JUDGE. *Reversed.*

*Earl McDowell,* for plaintiff in error.

*Willis E. Reed, Attorney General,* and *Charles S. Roe,* contra.

HAMER, J.

The plaintiff in error, Lloyd Cheney, was tried in the district court for Sioux county on the charge of stealing a steer, and was convicted and sentenced to the penitentiary for an indeterminate period of from one to ten years. He brings the case here for review, and alleges certain errors, the more important of which we will discuss.

The first assignment is that the evidence fails to sustain the verdict. It is shown by the testimony that one Chester H. Kramer, on whose premises the steer was kept at the time it was killed, was also informed against, but not prosecuted. The steer appears to have been running in the pasture with Kramer's cattle, and had been there since some time in July. It belonged to a man named Wolfe. Kramer owned the ranch, consisting of about 1,440 acres, and kept there from 40 to 150 head of cattle. He had about 90 there December 10, 1914. He was a man of family, kept house, and had men employed to assist on his ranch. He had lived many years at Bancroft, Nebraska, and moved from there up to Sioux county, and staid there about two years, when he moved back to the eastern part of the state and located at Pender, Nebraska, where he was living at the time of the trial of Lloyd Cheney. When Kramer moved up to Sioux county from Bancroft he took with him John E. Marshall, a witness in this case. Marshall was in the employ of Kramer on the ranch, and was 31 years old. He was a single man, and lived at Kramer's residence. He (Marshall) and Lloyd Cheney worked for Kramer, the latter only a small part of the

time.   They had been building a shed for him.   In this shed the steer was killed about noon on the 10th day of December, 1914.   The defendant was a single man. He lived with his sister, Mrs. Chris Morgan, and her husband.   He was accustomed to visit at Kramer's, presumably with Ed. Marshall.   Kramer testified on behalf of the state that Cheney had staid at his house on the night of December 9, 1914.   It is undisputed that when the steer was killed Kramer, the owner of the ranch, Ed. Marshall, who was his hired man, and the defendant, Lloyd Cheney, were all present and participated in the butchering.   Kramer testified that Lloyd Cheney "was back and forth between the two places every day or so." He was then referring to his own residence and the Morgan residence; that the defendant had been at his house three or four times between Thanksgiving and the 10th of December, 1914, and stayed over night two or three nights, and after that that he was there nearly all winter.   Prior to the 10th of December, 1914, he had resided most of the time at the Morgan residence, although the witness Kramer testified that the defendant was first at one house and then at the other.   Kramer was informed against, but he was not prosecuted.   He testified on behalf of the state and against the defendant.   The older men, Kramer and Marshall, were not prosecuted, but the young man was prosecuted.   Cheney does not seem to have received any of the meat.   Kramer, being a man of family and having help employed, may have needed it.

The testimony of the main witness for the prosecution, Chester H. Kramer, seemed to be introduced to show that he (Kramer) was not to be blamed for butchering the steer.   He said Cheney had been riding over his (Kramer's), place with him, and that they had talked about the ownership of the steer; that the conversation "naturally took place" on the ranch "some time or other when we were all together;" that, when riding over the place with the witness Kramer, Cheney had made mention that "we needed some meat;" that Cheney said: "This steer ought

to be butchered before somebody came and claimed it."
Kramer's testimony makes Cheney apparently anxious
that meat shall be speedily furnished for the Kramer fam-
ily and also for the Morgan family, and Cheney is made
to appear anxious for fear the supply of meat will be lost
because somebody may come and claim the steer. For so
young a man, 21 years old, Cheney is made to show a very
active and persistent anxiety to cause meat to be fur-
nished for other people's families. Kramer lays the whole
blame of bringing the steer out of the pasture and up to
the shed upon Cheney. He has Cheney rope the steer, and
he says that no other person helped Cheney. But Mar-
shall, Kramer's hired man, who was then working for
Kramer testified that Cheney did not rope the steer until
Kramer and Cheney had together driven the steer up to
the shed. Marshall testified: "Well, sir, I don't know
whether they drove him in (to the shed) or roped him
and dragged him in;" but Marshall remembered that the
day the steer was killed Kramer had gone over to Mor-
gan's place in the morning, and further remembered that
Kramer was with Lloyd Cheney when they got the steer
and brought it in. He says that he (Kramer) "come in
with him. Q. Was he walking or horseback? A. I
think he was horseback." Mrs. Chris Morgan testified
that the morning of the day when the steer was killed
Kramer came over to her house and asked her brother in
her presence "if he would go over and help him butcher,"
and that her brother "told him he would," and then that
they sharpened their butcher knives on the grindstone
before they went over to Kramer's, and that the night be-
fore that particular night her brother had stayed at Kra-
mer's. Her statement as to where her brother stayed on the
night of the 8th of December is corroborated by Marshall's
testimony. Marshall testified that he (Marshall) was
working for Kramer on the 10th of December, 1914, and
that the steer was butchered that day about noon, that
Cheney "was there helping off and on," and that Cheney
did not stay at Kramer's the night before the steer was

killed. Marshall testified that he (Marshall) slept at Kramer's the night before the steer was killed, and testified as follows: "Q. You may tell the jury whether Lloyd Cheney staid in that house that night or not. A. Well, sir, I don't just remember; I don't think he did, though. Q. Who staid in the ranch house that night? A. Mr. Kramer and Mrs. Kramer, Mrs. Bonsel, and myself." On the morning of the day when the steer was killed Kramer left his home to go to Morgan's residence, presumably. Marshall so testified, and Mrs. Morgan saw Kramer there at her house and heard him ask her brother to come and help butcher, and Cheney himself so testified. At Morgan's place they sharpened their butcher knives, and then went over to the shed on Kramer's place, where they were going to kill the steer as soon as they got it out of the pasture and drove it up there. Cheney testified that Kramer came to Morgan's place that morning and asked him (Cheney) if he could go and help butcher, and, when he said that he could, asked him to get a couple of butcher knives, and then, when he got the knives, they went out to the grindstone, and Kramer turned the grindstone and Cheney held the knives on the stone so that they might be sharpened. As they went to Kramer's through Kramer's pasture they picked up the steer. The steer and other cattle were running in a pasture of 600 to 800 acres belonging to Kramer. They (Kramer and Cheney) were both on saddle horses. Cheney so testified, and he is corroborated by Marshall. When they got the steer up to the shed then Cheney roped it, and when they got the steer into the shed Marshall tried to kill it with an ax, but, as the steer would not stand still, Marshall failed in his efforts to kill it, and then he (Cheney) shot the steer with a revolver, and in that way killed it. Marshall had known Kramer at Bancroft, and came up from there with him to Sioux county, and worked for him and remained with him about 14 months and until after the steer was-killed. Marshall testified that Kramer and Cheney came in with the steer together. He supposed that they came from the pas-

ture. He remembered that "they were both there with the steer. * * * Q. And how close to the shed were they? A. I don't know; they were right close to it, though. * * * Q. What is your best recollection as to whether Kramer was on horseback or on foot? A. I am satisfied he was on horseback that morning. Q. At this particular time. A. Yes; he had his horse down there then, when they was down there at the shed." When asked how Kramer came over to Morgan's place on the morning of the day when the steer was killed Mrs. Morgan answered: "He was on horseback." Marshall also testified that Kramer told Cheney "to go ahead and shoot it," meaning the steer. This was after Marshall failed to kill it with an ax.

There was some kind of an arrangement by which Kramer was not to be prosecuted. That Kramer should show anxiety to secure the conviction of Cheney was natural if it in any way affected the proceedings touching himself. That some sort of an understanding was arranged between the county attorney and Kramer is shown by the county attorney's testimony, which is very candid. The county attorney testified: "Q. Mr. Baker, tell the jury what arrangement you have made with Mr. Kramer as to immunity in the case of the state of Nebraska against Kramer, implicated in this case. * * * A. In the case of the state against Kramer, you mean? Q. Yes, sir. A. In that case the facts came to my knowledge that there had been a butchering down near Glen, and that both Cheney and Kramer were implicated in this butchering, and I believe that the sheriff first brought the information to me about that; * * * and he (the sheriff) brought Kramer to my office in the courthouse; and I believe that there Kramer related all about this butchering, and made an affidavit to what had happened down there, and I told Mr. Kramer that I could not guarantee him anything, but that I would say to the district judge that he had turned state's evidence, and that if he would do the square thing that I would give him a recommend to the judge." In any event Kramer would seem to have been quite active, and his ac-

tivity was directed against Cheney. He may have been trying to earn the recommend.

The youngest man in the company was selected seemingly as the person upon whom to inflict punishment. The jury were not satisfied, and did not wish to inflict the punishment upon young Cheney which their verdict called for, because they recommended his pardon. When a recommendation for a pardon comes from a jury in a cattle country and in a cattle-stealing case, it may be said that there is some substantial reason for it. In the verdict in this case the jury said: "But this jury strongly recommends that the defendant be pardoned."

The defendant testified that he staid at the home of his sister, Mrs. Morgan, on the night before the steer was killed, and that his sister's husband, Chris Morgan, was away from home at that time; and that his sister and her two little children were the only persons there except himself; also that he had never talked with Kramer or any one else concerning a desire to help in butchering the steer "which was afterwards butchered;" that Kramer came over to Morgan's place on the morning of the day when the steer was killed, and that he was riding a little buckskin pony; that it was then that Kramer asked for the butcher knives and asked the defendant to help him butcher, and that he (Cheney) agreed to do so, and that together they then sharpened the knives on the grindstone, and that he (Cheney) got his saddle horse and went home with Kramer, and that Kramer said that the steer that he was going to butcher was on the north quarter, and that they then took the one that was butchered and 12 or 14 others and drove the bunch up together; that Kramer said, "Let's kill him in the shed we are building," and that the shed would "be a windbrake;" that he (Cheney) then caught the steer (with a rope) and dragged it into the shed "out of the wind;" that Kramer said to "knock it in the head;" that they hit it a time or two with an ax and could not hit it right, and Kramer said, " 'Cheney, shoot him,' and I had a revolver on my saddle, and I shot it, and Mr. Kra-

mer cut its throat;" that at that time he (Cheney) had no
knowledge as to who owned the steer, and thought it be-
longed to Kramer, and that Kramer said it did; that the
witness saw Marshall come in; that the witness was sit-
ting down scraping the neck of the steer, and he heard
"something sizzling in the fire," and that he looked back
and that there was a piece of hide in the fire; that the wit-
ness inquired what was being done, and that Kramer said,
"That's none of your damn business;" that a piece of hide
had been cut out, and it was that which was sizzling in the
fire; that the witness was about ten feet from the fire;
that the witness ate supper at Kramer's, and after that
went home. The defendant explained that Kramer came
over on the day when the steer was killed and asked him to
come over and help butcher that day, and that he said,
"Yes; I guess so." He had been at Kramer's the day be-
fore, and was then working on the shed, but that night he
went home. He did not seem to have a guilty knowledge
concerning the butchering of the steer for the purpose of
appropriating it. His testimony was corroborated for the
most part by all the witnesses who knew the facts except
Kramer, who was peculiarly circumstanced. Kramer tes-
tified that at the time of butchering the steer Cheney
threw the piece of hide in the fire which bore the brand
that was on the steer. Kramer's testimony was disputed
by the evidence of both Cheney and Marshall. They both
testified that it was Kramer who threw the piece of hide
in the fire, and they substantially agree as to the indig-
nant inquiry which Cheney made of Kramer concerning
what he was doing when he threw the piece of hide in the
fire. Marshall testified as follows: "Q. Did you see any
skin or hide in the fire burning? A. Yes, sir. Q. Did
you hear anything said by the defendant to Mr. Kramer at
that time? A. I heard them talking; I thought they was
in fun, and I didn't pay much attention. Q. What was
said by Lloyd (Cheney) to Kramer? A. Lloyd asked
him what he was doing. Q. And what was the reply?
A. I don't remember whether he said 'darn' or 'damn';

he said it was none of his business anyway. Q. What was Lloyd doing at that time? A. Well, sir, I don't just remember; he was up at the head end of the steer." This puts Cheney at work where he could not have been cutting out the brand and throwing it in the fire. Cheney's inquiry as to what Kramer was doing related to Kramer's act in cutting out the piece of hide bearing the brand and throwing it in the fire. Kramer resented Cheney's right to interrogate him. If Cheney had been an accomplice of Kramer he would not likely have made such an inquiry in such a way. He would not have been surprised and angry. The point of counsel for the defendant that the evidence is insufficient to sustain the verdict has much to support it. There is no evidence that supports the charge against the defendant except Kramer's testimony. Kramer also testified that he thought Cheney had told him, he was not sure. Kramer tried to lay all the blame for what was done in butchering the steer upon Cheney, except that he acknowledged that he and Cheney took the hide off. Kramer testified to the brand and called it a double "T." He remembered also that a fire was built inside of the shed so that they could warm their hands by it while butchering the steer, but he was sure that Cheney destroyed the brand by cutting it out and putting the piece of hide on which it appeared in the fire, and he tried to put Chris Morgan in the deal, athough Morgan was not at home and was not shown by any testimony to have had anything to do with the theft. The purpose of this was probably to create suspicion against Cheney because he lived with his sister and brother-in-law.

The defendant was born in Box Butte county, Nebraska. His father took him along with him to Alabama when he was about nine years old, and subsequently the son returned to Nebraska and to the old neighborhood where he was born, and when his sister got married he made his home with her and her husband, Chris Morgan. He got employment at such work as he could get.

The county attorney in his cross-examination of Cheney seemed to attempt to make a point of some sort against Cheney because, when Kramer and Cheney were on their way to Kramer's place from Chris Morgan's residence, they picked up a bunch of cattle on Kramer's land and drove them and the steer that was to be killed down to the shed. It is a matter of common knowledge that one steer by himself is hard to drive, but he is easy to drive if he is with ten or a dozen other steers and they are all driven together. It is almost impossible to drive one hog by himself, but a dozen hogs may be driven together readily. This is common farm knowledge. The thing that they were doing was driving that one steer down to the shed so that he might be butchered, but they took the other cattle along so that one steer would be easy to drive. It was done under the direction of Kramer. It was Kramer's adventure. We are unable to find other testimony than Kramer's to the effect that Cheney knew that the steer belonged to some other person than Kramer. As to Kramer, the killing of the steer was theft because he was killing the steer to appropriate it and to use the meat. As to Cheney, the steer was to be killed for a lawful purpose, and he helped in the killing and butchering because Kramer asked him to do so. There is a failure of proof to connect Cheney in a felonious way with the killing of the steer.

There seems to have been an effort on the part of the sheriff to get Cheney to plead guilty before the county judge at the preliminary hearing. With the view to securing such a plea, the sheriff refused to tell Cheney whether "Kramer had turned state's evidence," but told him that he (the sheriff) "knew all that Kramer and Marshall knew about it." If Kramer was giving a false account of the killing of the steer, which he seems to have been doing, and this false account was carried to Cheney by the sheriff, it would justly excite the apprehension of Cheney, and, entirely independent of his guilt or innocence. Cheney might fairly and reasonably conclude that Kramer, and

the sheriff himself, would give just such an account of the butchering of the steer as would result in his (Kramer's) acquittal and in Cheney's conviction. Under this sort of an account of the sheriff to Cheney the latter appears to have said, according to the sheriff: "Well, then, I will go to the pen as sure as hell." The sheriff further testified: "Q. Did the defendant at that time say anything further to you in regard to the killing of the steer? A. Why, he said they had killed a steer, but he thought it was Kra-mer's when he killed it." Marshall was never arrested or in any way charged with stealing the steer, but Sheriff Hill seems to have tried to leave the impression with Cheney that both Kramer and Marshall "had turned state's evidence," which of course Marshall could not have done without being charged with the commission of the crime. Hill testified: "Q. And you knew there was no warrant out for Marshall? A. Yes, sir. Q. And did he (Cheney) not tell you after you told him that Ed. Marshall and Kramer had turned state's evidence that if they turned state's evidence they have jobbed me, and I probably will have to do time? A. Yes, sir; he told me that."

While the sheriff, Hill, finally denied that he had told Cheney that Marshall had turned state's evidence, he (Hill) had talked to Cheney in such a way as to induce that belief upon Cheney's part. Hill denied that he told Cheney that on the train, but said he told him that "in the jail." This was deception. The county attorney either did not know that Kramer and Cheney together drove the steer up from Kramer's pasture, or he desired to use the evidence for the sole and exclusive purpose of convicting Cheney. In his questions the county attorney is not shown by the record to have asked whether Kramer helped to drive up the steer from the pasture, but he starts in with the narrow inquiry concerning what happened at the shed. At the shed Cheney, who had been asked by Kra-mer to help butcher, threw the rope around the steer's head and put the other end of the rope on the horn of his saddle and pulled the steer into the shed. When Marshall failed

to kill the steer with the ax, then Cheney shot it at Kramer's request. Examination of Kramer by the county attorney: "Q. And how did this steer come to be in the shed? A. It was taken there. Q. Taken there by whom? A. Mr. Cheney. Q. How did he take it there? A. He had a rope on him and took him in with a saddle horse." The witness, John E. Marshall, seems to have also been called Ed. Marshall. He tried to be fairly honest. Kramer at the preliminary testified that he did not ask Cheney to come over to his house and help him butcher, and that he was in the house with Mrs. Chris Morgan. He testified he was there while the knives were being sharpened, but afterward at the trial insisted that he was wrong in his former testimony, and that he was not with Mrs. Chris Morgan at the time the knives were sharpened, but that the knives were sharpened at his (Kramer's) place on his grindstone. He testified that he did not think that he had asked anybody to help him butcher the steer except Ed. Marshall, the man who worked for him. He did not think that there was a grindstone at Marshall's place. He so testified.

When Kramer was asked if he had sold part of "this carcass," he answered that he had not. When asked if he had sold some of the carcass to Scott Chalfaunt, he answered, "Yes, sir," but subsequently amended it by saying that he had sold some of the meat of the second animal butchered, and that Chalfaunt "took a full quarter." He did not know whether the meat of this first steer had lasted until February, 1915.

· While this case may be tried again, it is perhaps well to consider some of the other alleged errors. Kramer testified in such a way as to cast suspicion upon the defendant by reason of what he (Kramer) said independently of his direct testimony. "Q. Who was the first man that suggested butchering this animal? A. Chris Morgan. Q. That is the brother-in-law of the defendant? A. Yes, sir." Counsel for the defendant moved to strike this out as hearsay and not binding on the defendant. The motion

was overruled, and the defendant excepted.  Morgan was never arrested.  Morgan was never charged in any way with being implicated in the theft, and this appears to have been done to give Cheney a rap.  It was done upon the theory that the defendant would be guilty of any bad sentiment that Morgan might entertain.

In *Wallace v. State,* 91 Neb. 158, it was said:  "In order to convict the defendant of the crime of larceny, as charged in the information, the state was required to prove, beyond a reasonable doubt, that defendant participated in the larcenous taking of the hogs in question from the complaining witness.  We think the evidence was insufficient to establish that fact beyond a reasonable doubt."

If Kramer's testimony is to be taken as true, then, and then only, is there enough evidence against Cheney to create any suspicion of his guilt.  If we follow the example laid down in the *Wallace* case, we will reverse the judgment of the district court.  It should be remembered that Kramer boldly expressed the desire to appropriate the steer.  Such testimony should not be permitted to determine the guilt of any person unless it is corroborated by other evidence worthy of belief.  The defendant never had the steer in his possession.  He did what Kramer requested him to do.  He helped to kill and butcher the steer, but he found it in Kramer's possession on Kramer's ranch, and he left it in Kramer's possession at Kramer's shed.  He did not remove the steer, and therefore there was no asportation, and consequently there could be no theft.  Asportation, nonconsent of the owner, and a felonious intent to thereby convert the stolen property to the defendant's own use are necessary elements of larceny.  *Ladeaux v. State,* 74 Neb. 19.

After Kramer butchered the steer Cheney visited with Marshall, who was Kramer's hired man.

The judgment of the district court is

REVERSED.

SEDGWICK, J., not sitting.