Jones v. State.

---

LEMUEL JONES v. STATE OF NEBRASKA.

FILED DECEMBER 1, 1917. No. 19734.

1. **Larceny: SUFFICIENCY OF EVIDENCE.** Evidence examined, its substance stated in the opinion, and found insufficient to sustain a conviction of the crime of stealing a gelding as charged in the information.

2. ————: **FELONIOUS INTENT.** To constitute the crime of stealing, there must have existed a felonious intent in the mind of the accused at the time of the taking.

ERROR to the district court for Grant county: JAMES N. PAUL, JUDGE. *Reversed and dismissed.*

*P. R. Halligan* and *Wilcox & Halligan,* for plaintiff in error.

*Willis E. Reed, Attorney General, contra.*

HAMER, J.

The plaintiff in error, Lemuel Jones, hereinafter called the defendant, was informed against in the district court for Grant county, on the 12th day of May, 1916, and was charged with stealing a gelding in said county on the 26th day of September, 1915, the personal property of one Emery Preston, and of the value of $85. There was a verdict of guilty, and judgment on the verdict, which sentenced the defendant to be imprisoned in the penitentiary at hard labor for not less than one year or more than ten.

It is conceded by the prosecution that the defendant took the horse under an alleged claim of right, but it is denied that he had such right, and, in an ingenious argument, counsel for the state strenuously endeavor to show that the conduct of the defendant was at least questionable and deficient in explanation.

It is immaterial whether the claim of the defendant to the possession of the horse was well founded, as he might think that the horse was his under the arrangement which he claims to have made with Preston, the main witness for the state, and which arrangement is supported by other testimony. The defendant may have had a right to take the horse, even though the jury might justly reach a different conclusion upon the evidence. In the case tried they were not trying title to the horse. They were trying to ascertain whether the defendant was guilty of the charge made against him. There can be no theft without a felonious intent upon the part of the person charged, and whether there was such intent was the sole question to be determined. The question of the defendant's guilt should not be made to depend upon whether he actually owned the horse and was entitled to its possession. The defendant

cannot be found guilty upon the theory that his title has failed.

It is claimed on behalf of the defendant that the evidence fails to support the verdict, and that the question of the defendant's felonious intent was properly submitted to the jury.

The jury were probably uncertain concerning the guilt of the accused, because they recommended a "light sentence." The jury are not very likely to do that sort of thing in a county where the chief business is to raise cattle and horses, and where every one perhaps feels the necessity of the protection of such property by severity of punishment. The evidence shows that the defendant needed to raise money to assist his sister in defraying the expenses of their mother's last illness and of her funeral. He went to a neighbor named Goslin, and the two consulted together as to what was best to be done. Goslin had a horse which he was willing to sell. He authorized the defendant to sell his (Goslin's) horse for $95, or he was willing to accept the defendant's horse in exchange for his horse, provided the defendant succeeded in selling Goslin's horse and failed to sell his own. Goslin seemed willing to do anything reasonable to help his neighbor out. Goslin turned his horse over to the defendant, and the defendant took the two horses down to Hyannis to meet the horse dealer there, whose name was Preston. Of course, if the defendant had sold his own horse to Preston he could have returned Goslin's horse to Goslin, or if he had sold Goslin's horse to Preston he could then have taken his own horse back and delivered it to Goslin. In any event the money which he was to receive, whether for his own horse or for Goslin's, would be his to use, and there would be no entangling or embarrassing circumstances connected with the transaction. It would then have been a clean deal. Preston insisted on buying both horses, and he put the price at $150 for the two. Preston knew that one of the horses did not belong to the defendant. He testified that Jones so told him, and that Jones "said the man (Goslin) sent him in and he had

a right to sell him." Preston was willing to buy the horses at once, although it was then late in the evening, and he did so, giving his check to Jones for $150. Preston testified that he bought the two horses in the livery barn, and that the defendant said to him that "if I would buy them that night it would be a great accommodation;" that George Galliard "held a lantern and I looked them over." The check given in payment for the horses appears to have been written by the light of a lantern. Preston testified: "George held the lantern while I gave the check." Then Preston took the horses over to his barn, so he testified. Jones testified that he told Preston that he could let him have the brown horse for a lower price than he could sell him the bay; that the brown horse belonged to him and the bay belonged to Mr. Goslin; that Goslin wanted so much, and he had brought the horse in, and "the arrangement was I could take him back or take mine and make myself square with Goslin." Also, he told Preston that Goslin had to have $95. The defendant testified that Preston told him to bring in the horses, "and he asked my price, and I told him, and then he started to jew me down, and I told him the arrangement was that I could take $75 for either horse, and I could take his horse back, and I couldn't sell both horses, and I told him that time and time again, and he kept railing at me and railing at me, and finally I said I was going home if he didn't take them, and he wanted me to take a check, and I finally took his check." Jones appears to have been dissatisfied with the deal which he had made with Preston, and the next morning he went to see him. "Q. Did you have another conversation with him the next morning? A. Yes, sir; and he knew then he had swindled me on the horses, and he said then that $75 was all that the Goslin horse was worth, and if Goslin was any man he would be satisfied. Q. Tell me what you said to him the next morning. A. I said I would give him $80 for either one of them back, I was afraid Goslin wouldn't be satisfied, and he said if the horses was there I could have them, and he said they was out at the Rangers Station, and if the old man was there I could leave the

money with him and take the horse." Will Dent testified that he saw Jones talking with Preston; that he heard part of the conversation: "Mr. Jones wanted a horse of Preston that Preston had bought of him, and he offered some price, and Mr. Preston said the horse wasn't here, but it was out at the Rangers Station, and he told him if it was here he could get it, and he said it was out at the Rangers Station, and he could get it there and leave the money with the man out there." The defendant testified that the Rangers Station was on his way home. He appears to have gone to the house at the Rangers Station as he went home, and he went out in the pasture and caught his horse and brought him back to the wagon and fed him, and then hitched him up and took him home. He took the horse in the presence of others. He testified that he intended to go to the post office the next morning and register the money back. He appears to have stayed at Jackson's that night, and it was late when they got there, and it was 8 o'clock in the morning before anybody woke up; that he didn't have any saddle to ride, and he knew the mail would be gone before he could get it there; that he was going to send the money from the Eddie post office.

When he got back he seems to have gone to see Goslin. He told Goslin he had brought his (Jones') horse back. Preston went to see Jones. Jones describes his interview with Preston as follows: "He said, 'Good morning,' and I said, 'Good morning,' and he said he came for the brown horse, and I said he couldn't have him unless he settled with Mr. Goslin, and I said, 'Here is your money,' and he said, 'I bought that horse and I am going to have him.'" Preston then seems to have called for White, and he told White that Jones had lied about the horse, and that Jones did not intend to turn him over unless Goslin said so. "He said all he wanted was to have a witness that I wouldn't turn him over. Q. Did you offer him the money again? A. Yes, sir; after they got in the automobile and started the engine, but had not started the wheels, I said 'Here is your money.'"

Jones then testifies that the transaction was on the night of the 24th, the same night as Home Day, and that he saw Preston the next morning and told him that he wanted one of the horses back, and that Preston told him that he could have one of them, and said that if the horse was there he could have it, but that the horses were not there; that they were at the Rangers Station, and "he said I could get the horse and leave the money with the old man.  *  *  *  I told him I would give him $80 for one of them. Q. Did you say which one? A. No, sir.  *  *  *  Q. And when you took a horse out of the pasture to replace Goslin's horse you took your horse? A. Yes, sir. Q. You were making the selection of the horse you was to take? A. The only one Preston would make an offer on singly was Goslin's horse, and I supposed that was the one he wanted." He testified also that he got the check cashed on the 25th. "Q. Did you have the money when you talked about paying him $80? A. I think I did." He testified he looked for the old man out at the place, and that the old man said he would be there; that he saw the old man as he went out, but that the old man was not there when he got there.  He explained that he did not leave any word with anybody at the place because there was nobody there.  Jones appears to have been ashamed of the transaction.  He testified: "Q. You sort of evaded the answer; you didn't tell them that you had sold these horses, but that you were taking one back? A. No, I was ashamed of my deal, I had been skinned too bad.  *  *  *  Q. How much money did you offer him back? How much did you tender him? A. Just the amount of the Goslin horse. Q. How much was that? A. $75." Goslin testified to the arrangement made between himself and the defendant Jones, and that, when Preston came and met Jones and said that he came after the horse, Jones said: "The horse is Goslin's and you can settle with him.  *  *  *  He had a roll of bills, and he said, 'Here is your money.'" The testimony of the defendant concerning the arrangement to go out and get the horse does not seem to be clearly denied, and Preston admits there was talk about taking one of the horses back. While

he did not find the old man at the house, and so did not give him the money, he took the horse in the presence of one Jackson, and there was no concealment of the taking.

Instruction No. 7 reads as follows: "You are instructed that in this case, in order to convict the defendant of the crime charged in the information, you must find from the evidence, beyond a reasonable doubt, that at the time of taking said gelding defendant then and there intended to deprive the owner of said property permanently and to convert it to his own use and benefit." This instruction omits the necessity of finding a felonious intent in order to justify a verdict of guilty, and it authorizes the jury to find the defendant guilty without proof of such intent. *Dobson v. State,* 61 Neb. 584; *Wallace v. State,* 91 Neb. 158; *Mead v. State,* 25 Neb. 444. In *Dobson v. State, supra,* the court instructed the jury, in substance, that if Dobson took the calf into his possession and sold and delivered the same to Jerry Kelly, with the intention then and there to convert said calf to his own use, and to permanently deprive the owner thereof of said property, then you are instructed that such action would constitute a larceny of said calf. In the syllabus it was said: "An instruction whereby the whole case is attempted to be covered, but which omits an essential element, is erroneous, and is not cured by another instruction which covers the point." In *Mead v. State, supra,* the instruction said nothing about felonious intent, but did say: "With the intent to permanently deprive the owner thereof of his property."

When the defendant took the horse he is shown by the evidence to have believed that Preston had authorized him to do so. In that event he could not have had any felonious intent. *Mead v. State,* 25 Neb. 444; *Wallace v. State,* 91 Neb. 158; *Bartels v. State,* 91 Neb. 575.

We have carefully examined instructions Nos. 5 and 8, and the argument of counsel for the state concerning them. No. 5 makes the guilt to depend upon the "intent of permanently converting it (the property) to a use other than that of the owner." No. 8 devotes five typewritten lines to "asportation or carrying away," and says that the tak-

ing of an article is feloniously accomplished by holding, grasping, seizing, or taking possession of it, but nothing is said in that part or in the latter part as to what sort of purpose constitutes a felonious intent, and the jury are not instructed concerning the subject.

Preston, in the presence of Dent, seems to have told Jones that he (Jones) could go out to Rangers Station and take one of the horses, leaving the money with the old man in charge. Jones and Dent so testified, and even Preston admits there was talk about Jones taking back one of the horses. Jones caught one of the horses and took it in the presence of Jackson. While he did not leave the money, as he alleges because there was no one there to receive it, he has since been trying to pay it to Preston, who refuses to accept it. When Preston went to Jones' house the horse was there, and Jones and his brother promptly said so. Jones did not try to run the horse out of the country, nor is it shown that he tried to sell it, or otherwise dispose of it. Neither did he slink away or try to conceal himself, and when Preston talked of arresting him, and charged him with being a thief and became somewhat obtrusive, Jones met him more than half way, and Preston appears to have thought he was compelled to defend himself by the use of a board which he held up in front of him as a guard against Jones' threatened attack. Because of the giving of the above instruction, and because the evidence wholly fails to establish a felonious intent on the part of the defendant, the judgment of the district court is reversed and the case dismissed.

REVERSED AND DISMISSED.

SEDGWICK, J., not sitting.