DON L. BROWNRIGG V. STATE OF NEBRASKA.
287 N. W. 193

FILED JULY 21, 1939.   No. 30614.

*Archie M. Smith* and *Boyd P. McGuire,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Don Kelley, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

This is a criminal case, wherein the defendant is charged with the crime of stealing a hundred-dollar bill from the person and against the will of one Nels Person, but without putting him in fear, and without threats or the use of force or violence.   The information thus charges larceny from the person, as set out in section 28-510, Comp. St. 1929.   The jury returned a verdict of guilty, and the sentence was two years in the penitentiary.

In the information, one Paul Hamilton is charged jointly with Don L. Brownrigg, the defendant herein, for the same offense.   They were given separate trials, and the defendant Don L. Brownrigg was tried first.

The complaining witness, Nels Person, a farmer, 58 years of age, living five miles west of Walthill, Thurston county, received a check on or about May 9, 1938, from Melvin McGuire, known better as "Mickey" McGuire, for $378, but which is sometimes also referred to in the evidence as one for $350, which check on the same day he presented for payment at the bank in Wisner, Cuming county, receiving in payment therefor United States currency, some twenties and a hundred-dollar bill. Person put the money into two pockets in the bib of his overalls. Part of it was in the right bib pocket, and only the hundred-dollar bill and his glasses were put in the left bib pocket. With this money in his pockets, he had his son drive him to Walthill, where he went to the toilet in Bourelle's pool hall, still in possession of the money, and left immediately. As he came out of the pool hall, he saw the defendant and one Hamilton, who came right up to him, shook his hands, and put their arms around him. It was the first time he had seen them that day. While being thus greeted, Person said, his glasses commenced to rattle, and as they left him he looked in his pocket and the hundred-dollar bill was gone.

Pat Young, a 16-year-old boy, states that the defendant had his hand on one of Person's shoulders, and that Hamilton took the bill from the pocket. How it was done is not so important, except in determining what aid the defendant furnished to Hamilton, who, during this greeting and ceremony, actually removed the hundred-dollar bill from the bib pocket. Immediately after the larceny, both Hamilton and the defendant left the scene of the crime and proceeded up the street together. On direct examination, Pat Young testified that he saw Hamilton hand the money to the defendant when they got up the street a short distance. On cross-examination he reduced the statement to the extent that it was something that looked like a bill. The defendant positively denies that Paul Hamilton handed him anything of any kind.

Nels Person immediately called the police. Night Marshal Riley responded, and found the defendant and Hamilton

sitting in a car belonging to Dave Ring, who they had hoped would take them home. Riley placed them both under arrest, and asked Ring to drive to Coleman's office, which was done, Riley riding on the outside of the coupé. When they reached Coleman's office, Riley took them inside and charged them with taking the hundred-dollar bill. They both denied it, and said, "You can search us." Riley said, "Wait a minute, I will look the car over." Riley immediately found the hundred-dollar bill on the little ledge back of the seat.

The defendant took the witness-stand in his own behalf, and stated that he was 39 years old, and had a wife and four children, ranging from 6 to 16 years of age. He worked at farming and common labor. On this day in question, he said, he was pretty drunk; that he had met Mason Brown in the pool hall, and gave the answer: "I asked Mason, I says, 'I got some alcohol. Get a bottle of pop and we will mix up a drink.' So we had a drink. Q. Did Mason say anything to you about going home? A. He said, 'You are getting pretty drunk. You better go home,' or words to that effect."

Defendant says that, when he came out of Bourelle's pool hall, Paul Hamilton was talking to the complaining witness, who was sitting on a bench, and looked like he was drunk. He also says Hamilton was "shagged up." He admits he slapped Nels Person on the shoulder as he greeted him. He said when Riley came up to the car in which they were sitting, and "pinched" them, he did not think anything about it, as they had both been drinking. He denied that he took the hundred-dollar bill, or had ever seen it.

U. G. Austin was called as a witness for defense, and said that same evening he was talking with the complaining witness, who told him that he gave Hamilton and Brownrigg a dollar to buy beer with when they came up and greeted him. This might have given the jury the idea that he gave them the hundred-dollar bill by mistake for a one-dollar bill, but in direct examination of the defendant he was asked what "Lys" Austin told him coming over to Pender, and the answer was, "He said, 'Nels said to me, Nels told me he gave

Paul a dollar.' I said, 'I don't know anything about it.'"
So whatever the purpose of this evidence, the defendant himself disclaims all knowledge of it.

The defendant insists that, if any crime at all was committed, it was done by Paul Hamilton, who is now serving time in the reformatory on another charge. Section 28-201, Comp. St. 1929, says: "Whoever aids, abets or procures another to commit any offense may be prosecuted and punished as if he were the principal offender." This court said that this section means that the same rules as to information, conduct of the case, and punishment heretofore applicable to the principal should hereafter govern his aider, abettor, or procurer, and that no additional facts need be alleged in an information against such accessory before the fact than are required against his principal. *Scharman v. State*, 115 Neb. 109, 211 N. W. 613; 10 Neb. Law Bulletin, 170.

The second proposition of law of defendant is that mere presence at the place of crime does not create guilt. We are cited to 1 Bishop, Criminal Law (8th ed.) sec. 634: "Since mere presence at a crime does not create guilt, if while two or more are lawfully together one does a criminal thing, the others whose wills did not concur therein are not answerable."

In an old case in Iowa in 1879, concerning the robbery of a safe at a saw-mill, when a third man admitted he was with the two who did the act, it was said: "Where * * * he (the defendant) connected himself with others who it was claimed actually committed the robbery in question, *held*, that whether he was so with them as an honest dupe or criminal accessory was properly left with the jury to determine upon all the circumstances of the case." *State v. Lucas*, 10 N. W. 868 (57 Ia. 501).

The evidence in this case impressed the jury that the defendant was not teamed up with Hamilton by accident, or as an honest dupe, and the evidence supports the verdict.

The third and last proposition of law argued by the defendant for a reversal is: "Larceny involves a felonious

intent, and if one who takes property is too drunk to have any intent, he is not guilty of it."

It may be admitted that there are many references in the evidence of the defendant to the fact that defendant Brown-rigg and Paul Hamilton were intoxicated at the time. To support this third proposition of law, the defendant cites us to *People v. Walker*, 38 Mich. 156, which says: "While it is true that drunkenness cannot excuse crime, it is equally true that when a certain intent is a necessary element in a crime, the crime cannot have been committed when the intent did not exist. In larceny the crime does not consist in the wrongful taking of the property, for that might be a mere trespass; but it consists in the wrongful taking with a felonious intent; and if the defendant, for any reason whatever, indulged no such intent, the crime cannot have been committed."

Defendant also relies upon *Jones v. State*, 101 Neb. 847, 166 N. W. 252, which was cited during argument, where we held: "To constitute the crime of stealing, there must have existed a felonious intent in the mind of the accused at the time of the taking;" and also *Cheney v. State*, 101 Neb. 461, 163 N. W. 804, to the same effect.

In *O'Grady v. State*, 36 Neb. 320, 54 N. W. 556, Judge Babcock gave an instruction reading as follows: "The jury are instructed that voluntary intoxication or drunkenness is no excuse for a crime committed under its influence, nor is any state of mind resulting from drunkenness, short of actual insanity or loss of reason, any excuse for a criminal act. Where without intoxication the law would impute a criminal intent, proof of drunkenness will not avail to disprove such intent where the drunkenness is voluntary." It was held, in an opinion by Chief Justice Maxwell, that the rule as stated in the second part, without qualification, is too broad, and that "at the present time evidence of intoxication may be admitted to determine whether or not a crime has been committed or where it consists of several degrees depending on the intent, the grade of the offense."

It has often been said that at common law voluntary

drunkenness at the time of the commission of a crime was regarded as an aggravation rather than an extenuation, and that voluntary drunkenness was no defense whatever to one charged with crime, but the rule has been modified in many jurisdictions, in which it is held that the fact of voluntary drunkenness is admissible in evidence for the purpose of showing lack of malice or intent. *Blackburn v. Commonwealth,* 200 Ky. 638, 255 S. W. 99.

One cannot, because he is intoxicated, avail himself of his intoxication to exempt him from any legal responsibility which would attach to him if sober. *Commonwealth v. Taylor* (1928) 263 Mass. 356, 161 N. E. 245.

It is held that, when intent is a necessary element of the crime, and where the intoxication entirely suspended the power of reason, then the accused is incapable of forming an intent, and he cannot be held guilty unless the intent was formed before intoxication. *People v. Cochran,* 313 Ill. 508, 145 N. E. 207.

"Although voluntary intoxication is not an excuse for crime, it has an important bearing on the question of guilt as regards any crime of which a specific intent is an essential element. Of course, the mere fact that a person was intoxicated at the time he did a criminal act does not show that he was incapable of forming an intent, for a man may be drunk and at the same time be able to deliberate." 15 Am. Jur. 30, sec. 340.

The defendant's counsel, in his final appeal, says that their drinking habits, their acquaintance with Person and his drinking habits, lead us to the inevitable conclusion that the only purpose of Hamilton and Brownrigg approaching Person on this occasion was because they wanted to get a loan of 50 cents or a dollar with which to buy liquor.

Doubtless this same argument, and more of it, was made to the jury, but the jury would recall that they did not need liquor, because the defendant had testified that he had a bottle of alcohol. The defendant recalls many details of the entire occurrence, with a memory much too keen to show any serious effect of the liquor he had been drinking.

We have now carefully examined all of the cases cited by the defendant, together with the argument in his brief, upon his third proposition of law, that if one who takes property is too drunk to have any intent he is not guilty of taking it. As the trial court gave no instruction on the subject of drunkenness, and as the defendant requested no instruction to be given on that subject, it only becomes pertinent to the issues under the first paragraph of the motion for a new trial, that the verdict is not sustained by the evidence. It may be admitted that the evidence of the defendant keeps this subject of intoxication in the forefront from beginning to end. The jury weighed the evidence touching this question, as they did all other questions, and this court is content to rest this question with the jury, who found that he was guilty on the information filed.

The sentence could have been for seven years under this verdict of guilty, but the trial court, considering all the facts, gave a sentence of only two years. We see no error in the record, and the sentence is hereby

AFFIRMED.