(No. 15989.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WALTER C. COCHRAN, Plaintiff in Error.

*Opinion filed October 28, 1924.*

1. CRIMINAL LAW—*errors assigned but not argued are waived.* It is not sufficient merely to assign errors, and where no reasons are urged in support of errors assigned they are waived.

2. SAME—*when statute is not complied with in selecting jurors.* The board of supervisors in selecting from the petit jury list the names of the jurors who are to serve for the ensuing year does not act in accordance with the statute where the selection is made by the judiciary committee of the board without the names on the petit jury list being read to the board or the names of the jurors selected being attached to the committee's report or read or presented to the board.

3. SAME—*when irregularity is ground for challenge to array of jurors.* While a mere irregularity in failing to comply strictly with the statutory provisions, if not prejudicial, will not invalidate the list of jurors, a disregard of the material provisions, which are designed to secure an impartial trial, is not a mere irregularity and is ground for challenging the array.

4. SAME—*what instruction is erroneous in not limiting period of defendant's sanity.* Where insanity is set up as a defense in a prosecution for murder, it is error to instruct the jury that if they believe from the evidence "that before the commission of the alleged homicide defendant was sane" they should find him guilty even though he committed the act when under the influence of intoxicating liquor, as such instruction does not sufficiently limit the period of sanity and would authorize a verdict of guilty if the defendant was sane at any time prior to the alleged homicide.

5. SAME—*insanity may arise from frequent intoxication.* Long continued habits of intemperance which produce permanent mental diseases amounting to insanity, which so weaken and impair the mind that one committing an offense has not mind enough at the time to know right from wrong and has not sufficient mind and will power to refrain from doing the act, relieve a person from responsibility under the law, the same as insanity from any other cause.

6. SAME—*intoxication may relieve defendant of responsibility for crime involving intent or malice.* While voluntary intoxication is not an excuse for the commission of a criminal act, yet where intent is a necessary element of the crime and the intoxication is so extreme as to suspend entirely the power of reason, the defend-

ant cannot be convicted of any crime which involves intent or malice unless the intent was formed before the intoxication, but he can be convicted of committing, while in such state of intoxication, a crime which consists only of the doing of acts which are prohibited by law and in which intent, deliberation or malice is not an element.

7. SAME—*"malice aforethought" implies some action of brain prior to commission of crime of murder.* While intent to kill is not an essential element of murder, the act of unlawful killing does not of itself constitute murder; and malice aforethought, as the word "aforethought" implies, requires an action of the brain prior to the act.

8. SAME—*when recitals of facts in an insanity hearing are not competent.* Where a defendant pleads insanity and introduces transcripts of the final orders of county courts of two other States adjudging him insane several years prior to the commission of the crime, the transcripts of the final orders are competent evidence, but recitals of facts therein as to the defendant's symptoms and as to the cause and progress of his disease are not competent evidence as to the existence of such facts.

9. SAME—*presumption of sanity does not shift burden of proof to defendant—instruction.* Where insanity is set up as a defense in a murder trial the presumption of the sanity of the defendant does not shift the burden of proof to the defendant, but the burden rests upon the prosecution throughout the trial to prove, beyond a reasonable doubt, that the defendant committed the act while he was sane; and it is error to instruct the jury that before they "can legally acquit the accused of said crime on the ground of insanity it must appear from the evidence in the case that at the time of the alleged crime the accused was not of sound mind."

10. SAME—*what must be proved by prosecution where insanity is the defense.* Where insanity is the defense to a prosecution for murder and there is evidence tending to show that the accused was insane at the time of committing the act, the burden is upon the State, regardless of the presumption of sanity, to prove, beyond a reasonable doubt, that at the time of the commission of the crime the accused had sufficient mentality to distinguish between right and wrong as to the particular act and that he was capable of exercising the power to choose between the right and the wrong, and if the evidence fails to show both such facts beyond a reasonable doubt it is the duty of the jury to acquit the defendant.

11. SAME—*when an instruction as to presumption of law should not be given.* An instruction as to what the presumption of law is upon a question of disputed fact is likely to mislead the jury and should not be given.

12. SAME—*physicians testifying as lay witnesses on question of insanity may be cross-examined as to knowledge of subject.* Where insanity is the defense to a prosecution for murder, physicians who testify, from observation and conversation with the defendant, as lay witnesses, may be cross-examined by counsel for the defense as to their knowledge of the disease to which they testify the defendant is subject.

13. SAME—*when defendant's testimony in another case cannot be used against him on question of insanity.* Where the defendant sets up insanity as a defense to a prosecution for murder committed while in a state of intoxication, his testimony, when taken by the State's attorney before the grand jury investigating the illegal sale of liquor, cannot be used against him in the murder trial on the question of his insanity, as such procedure is a violation of the defendant's constitutional rights, even though he was told he did not have to testify before the grand jury and that his testimony might be used for any lawful purpose.

FARMER, J., dissenting.

WRIT OF ERROR to the Circuit Court of Washington county; the Hon. LOUIS BERNREUTER, Judge, presiding.

CHARLES A. KARCH, J. PAUL CARTER, and HERBERT F. LILL, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, H. C. LINDAUER, State's Attorney, EDWARD C. FITCH, and H. H. HOUSE, (A. B. DAVIS, and A. W. PETH, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Walter C. Cochran, was indicted by the grand jury of St. Clair county, Illinois, charged with the murder of his wife, Mamie Cochran, by shooting her with a revolver. A petition for a change of venue filed by plaintiff in error because of the prejudice of the inhabitants of St. Clair county was granted despite affidavits to the contrary filed by the State, and the cause was transferred to Washington county. Plaintiff in error was arraigned Oc-

tober 4, 1923, and on October 15 his motion for continuance was overruled and the cause re-set for October 19. On the granting of the motion for change of venue the trial was re-set for November 21, 1923. Another postponement was granted until December 10, 1923. Six days later, on Sunday, December 16, 1923, the jury in said cause returned a verdict of guilty and fixed his punishment at death by hanging, upon which verdict judgment was entered. He has sued out a writ of error to reverse the judgment of the trial court.

The shooting occurred on the morning of the 10th of September, 1923, in the city of Belleville, in the county of St. Clair. Practically unknown, plaintiff in error arrived in that city May 4, 1923. About a month later, with his wife, he took up his residence in the house where the crime was enacted the following September 10. After coming to Belleville he worked for T. J. Christman, a contractor, decorator and painter, and Fred Saeger, a contracting painter, and from August 6 to September 1 he worked at the painting trade for Walter C. Brown. The evidence fails to show that he worked for anyone between September 1 and the 10th, the day of the shooting. The Cochrans resided at 412 East B street, in Belleville, two blocks north of Main street, and occupied the easterly side of the house, which faced north. The westerly tier of rooms in the residence building were three in number, the front room being occupied by a single man named Bean and the two rooms to the rear being occupied by F. E. Bascom and family. The Cochrans and Bascoms made common use of the yard to the south of the dwelling. A path or brick walk extended from practically the center of the building backward the length of the lot to a structure enclosing the outdoor toilet and coal shed. Adjacent to this structure was a small cabin occupied by Mrs. Belle Wangelin, who also shared the rear part of the yard with the Cochrans and Bascoms. Briefly stating the circumstances attending the killing, the evidence discloses

that on Sunday afternoon, the day previous to the shooting, a baby born to Mrs. Cochran on August 13, 1923, was christened in a Catholic church and immediately thereafter a small christening party was held at the Cochran home. There is no evidence that Cochran became even slightly intoxicated from drinking on Sunday. He left home about eight o'clock in the morning of the shooting, passing over the walk and into the alley in the rear of the home. He returned half an hour afterwards and entered his home, there being nothing unusual in his appearance at either time. Mrs. Cochran was washing clothes at the time in the back yard, just west of the Cochran kitchen and in front of the window of the rear room occupied by the Bascoms. Cochran, upon leaving the house the second time, walked to the tub and said to his wife, "You come go back there with me," to which she replied, "Daddy, I am washing," and he then repeated his first remark, her second answer being, "Daddy, I want to do my washing." Cochran then said, "You are coming with me," and he then took hold of her arm and they went on down the walk and into the shed. Almost immediately thereafter Mrs. Cochran's screams were heard by Mr. and Mrs. Bascom, Mrs. Wangelin and John Engler, an iceman who at the time was delivering ice to the Wangelin cottage. They all then went to the shed. Engler's testimony was to the effect that he heard Mrs. Cochran, while in the shed, say, "Daddy, why do you want to hurt me? We were so happy yesterday." To this remark there was no response. Bascom then said, "Don't hurt that woman," to which Cochran replied, "Don't get mixed up in this." Mrs. Cochran motioned to the bystanders not to interfere. In a minute or two Cochran and his wife left the shed and walked up the sidewalk arm in arm,—lovingly, as one of the witnesses stated,—into the house. A minute or so later shots were heard, and Mrs. Cochran and her mother, Mrs. Hall, who had assisted her since the birth of Mrs. Cochran's child, came out the rear

door and walked in a staggering manner along the east side of the dwelling towards the front of the house. Mrs. Cochran was in the lead, carrying her baby. Before reaching the front of the house Mrs. Cochran staggered and fell, and Cochran, who remained in the house, was then seen to fire one or two more shots at her body.

There is no dispute in the evidence that Cochran immediately after firing the first three shots barricaded himself in the home and maintained an armed defensive, and for an hour or more there was a sort of desultory warfare between Cochran from inside the house and a large crowd outside, estimated from many hundreds to several thousands, in which 240 shots were fired into one room of the house, and in another room the walls were so badly riddled with shot that the holes could not be counted. During this warfare two police officers were wounded, the mother-in-law, Mrs. Hall, being mortally wounded by one of the three shots fired by Cochran while she was in the dwelling. Approximately three or four hours later, or at one o'clock of the same afternoon, Cochran was captured, following the explosion of tear bombs in the house thrown by officers. He was found behind the stove in the kitchen with four unexploded cartridges in his revolver.

There was no evidence that any cause for ill-feeling had ever existed between plaintiff in error and his wife and no evidence of any previous quarrels or threats of violence. There was no apparent rational motive for the crime. The reason assigned by plaintiff in error in his conversation with the alienists was that he had been pursued by the Masons for many years, and that in carrying out their plans against him they had followed him from Tennessee to Louisiana and from Louisiana to Texas; that they had offered a reward of $1000 for him; that a man got $1000 to shoot at him, and that his wife had become associated with and was an agent of the Masons; that he did not want to believe it, but more and more he became convinced that she was a

313—33

Masonic conspirator and an agent of theirs to do him harm, and when asked why he killed his wife he used a figure of speech to illustrate his meaning, saying, "If a rattlesnake was coiled at you, set and ready to spring, what would you do?"

The assignment of errors consists of eighteen points, but plaintiff in error in his brief relies on only five of these points, and as no reasons are urged in support of the other alleged errors they are waived. *People* v. *Hohimer,* 271 Ill. 515; *Sullivan* v. *Atchison, Topeka and Santa Fe Railway Co.* 262 id. 317.

It is contended by plaintiff in error that the clerk of the circuit court of St. Clair county, from which the change of venue was allowed, failed to make a full transcript of the record and proceedings in the case and transmit the same, together with all the papers filed in the case, as required by the statute, and that it was not properly certified by the circuit clerk of St. Clair county. The clerk's certificate is not abstracted, and from an examination of the abstract, alone, it does not appear that there were any defects or omissions in the premises.

Plaintiff in error contends that a challenge to the array of jurors should have been sustained by the court. The board of supervisors of Washington county, on December 4, 1923, at an adjourned session of the September, 1923, term, adopted a resolution "that the list hereto attached, being a list of not less than one-tenth of the legal voters of each township in Washington county, be and the same is hereby known as the petit jury list of Washington county, in accordance with section 1, chapter 78, of Smith-Hurd Revised Statutes of Illinois." A list of names was attached to this resolution but the list was not read to the board of supervisors. The list was filed with the county clerk and by him copied into a book known as "Jury List Book No. 2." On the same day the following resolution was adopted by the board of supervisors:

"*Be it Resolved by the Board of Supervisors of Washington County, Illinois,* that the committee on judiciary of this board be and is hereby authorized to select at such times as required, from the petit jury list of Washington county on file in the office of the county clerk, a number of persons equal to 100 for each trial term of the circuit court and other courts of record to be held during the succeeding year, to serve as petit jurors, as provided by section 2, chapter 78, of Smith-Hurd Revised Statutes of Illinois."

Thereupon the committee on judiciary of the board of supervisors repaired to the office of the county clerk, took the book "Jury List Book No. 2," and checked off on the book 400 names by placing a red check-mark on the book opposite each one of said 400 names, and thereafter reported to the board of supervisors as follows: "We, your committee on judiciary, beg to report that we have selected from the jury list of Washington county on file in the office of the county clerk and correctly copied into the 'Jury List Book No. 2,' on pages 198 to 216, both inclusive, a number of persons equal to one hundred (100) for each trial term of the circuit court and other courts of record to be held during the succeeding year, to serve as petit jurors, as provided by section 2 of chapter 78 of Smith-Hurd Revised Statutes of Illinois." The report of the committee was approved by the board of supervisors. The list of 400 names was not attached to the report of the judiciary committee nor was any list of the 400 names presented to or read to the board of supervisors.

The action of the board of supervisors with reference to the list of 400 names was not in accordance with the statute. As was said in *People* v. *Boston,* 309 Ill. 77: "The provisions of the statute are so plain and unambiguous that the simplest directions we can give for the preparation of the jury list, the selection of the names of the persons to be placed in the jury box, and the method of drawing the jurors, is that the statute be read and followed." The list of 400 persons was not in any manner presented to the board of supervisors so that it could exercise judgment in

the selection of the persons to be placed upon such list. While mere irregularities in failing to comply strictly with the statutory provisions, if not prejudicial, will not invalidate the list of jurors, a disregard of the material provisions which are designed to secure an impartial trial is not a mere irregularity and is ground for challenging the array. *People v. Boston, supra.*

It is contended by plaintiff in error that all of the instructions given on behalf of the People touching the theory of or making reference to intoxication of the plaintiff in error were wrongfully given because of no basis in the evidence therefor, and that they were calculated to mislead and prejudice the jury. Particular attention is directed to People's instruction No. 7, which reads as follows:

"The court further instructs you, that if you believe, from the evidence, beyond a reasonable doubt, each of the following propositions, to-wit: That before the commission of the alleged homicide defendant was sane, and had the power to abstain from drinking intoxicating liquor; that the defendant then knew that the drinking of intoxicating liquor by him would have the effect to render him insane or crazy; that the defendant, so knowing the effect of intoxicating liquor upon him, and being sane, and having the power to abstain from drinking intoxicating liquor, did then and there voluntarily drink intoxicating liquor; that the intoxicating liquor so drunk by the defendant then and there made him insane or crazy; and that insane or crazy from the effects of such intoxicating liquor so drunk by him, the defendant committed the act of shooting and killing Mamie Cochran as charged in the indictment at the time and place, and in manner and form, therein charged, then you should find the defendant guilty."

This instruction evidently was based on one given in *Upstone v. People,* 109 Ill. 169, but fails to incorporate any restriction as to the time of plaintiff in error's alleged sanity before the commission of the crime. The instruc-

tion, as given, is unquestionably bad in this case. The jury by this instruction are given to understand that if the defendant at any time prior to the alleged homicide was sane and had the power to abstain from drinking intoxicating liquor, and that he knew that such drinking would render him insane or crazy, and that while so insane or crazy he shot and killed Mamie Cochran, they should find him guilty. The instruction fails to fix a definite time as to plaintiff in error's sanity preceding the shooting and is erroneous in this respect.

Eddie Hall, a brother of Mrs. Cochran, testified that plaintiff in error told him that he had been committed to the insane asylum at Wichita Falls, Texas, on account of heavy drinking of bootleg whisky. S. M. Lougeay, the county physician of St. Clair county, testified that plaintiff in error told him that he was confined in the insane asylum at Wichita Falls on account of an attack of drunkenness. Carl Rosenberg, a deputy sheriff, testified that plaintiff in error said that in the south he had got into some trouble with some policemen and that they had locked him up; that they had him locked up for a day or so in some institution; that they took him there because they thought he was crazy at first, but after he was there four or five days he got a job painting; that he had that job for about six months and then he got acquainted with a woman that was nursing there and he left with her and married her; that they did not have him in there for being crazy, but for drinking.

There is evidence in the record that while in the insane asylum at Wichita Falls plaintiff in error was suffering from an attack of insanity from which a patient never recovers. By instruction No. 7 the jury might be led into the erroneous belief that if plaintiff in error was sane prior to his incarceration in the insane asylum at Wichita Falls, that he then voluntarily drank intoxicating liquor knowing that it would make him insane, that he then became insane as the result of drinking such intoxicating liquor and that

that insanity continued down to the time he killed his wife, such insanity would not be a defense even though it was to such an extent that he was not able to distinguish between right and wrong, or, being able to distinguish between right and wrong, had not sufficient mentality and will power to refrain from doing the act which resulted in the death of his wife. Long continued habits of intemperance which produce· permanent mental diseases amounting to insanity, which so weaken and impair the mind that one committing an offense has not mind enough at the time to know right from wrong and has not sufficient mind and power of will to refrain from doing the act, relieve a person from responsibility under the law. Insanity of this sort and thus produced is the same, in law, as insanity arising from other causes. (8 R. C. L. 108.)

While voluntary intoxication is not an excuse for the performance of a criminal act, yet where intent is a necessary element of the crime it was the rule at common law, and is the settled law of this State, that where intoxication is so extreme as to suspend entirely the power of reason and the accused is incapable of forming an intent, he can not be held guilty of such crime unless the intent was formed before the intoxication. *Bartholomew* v. *People,* 104 Ill. 601; *Schwabacher* v. *People,* 165 id. 618; *Bruen* v. *People,* 206 id. 417; *People* v. *Jones,* 263 id. 564; *People* v. *Wright,* 287 id. 580.

By the statute of this State "murder is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied. * * * Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

While intent to kill is not an essential element of murder, the act of unlawful killing of itself does not constitute murder, and malice aforethought, as the word "aforethought" implies, requires an action of the brain prior to the act. In *Regina* v. *Doherty,* 16 Cox's C. C. 306, it was held that the word "aforethought" did not necessarily mean premeditation, but that it did imply an intention which must precede the act. In *People* v. *Brislane,* 295 Ill. 241, which was a prosecution for murder, this court said: "The rule is, that if plaintiff in error, at the time of the commission of the crime charged, was wholly incapable of forming the intent charged, whether from intoxication or any other causes, he is guilty of no crime." In this State there are two degrees of homicide: murder, which has heretofore been defined; and manslaughter, which by statute is defined as "the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever." In 8 R. C. L. 132, the rule is laid down that where the degree of the offense depends upon the question of malice, evidence that the perpetrator of the crime was so intoxicated as to be mentally incapable of entertaining a malicious motive is proper and material. From an examination of the authorities in this and other States we are of the opinion that the true rule is, that where intoxication is so extreme as to suspend entirely the power of reason and the accused is incapable of any mental action he cannot be convicted of any crime which involves intent or malice, but that he can be convicted for committing, while in such state of intoxication, a crime which consists only of the doing of acts which are prohibited by law and in which intent, deliberation or malice is not an element.

At the request of the State's attorney the court gave not only the instruction above quoted, but four others to the effect that voluntary drunkenness was no defense in this case. We have so often condemned the practice of giving

several instructions upon the same subject that we refrain from more than mentioning the impropriety in this case.

The evidence shows statements of the plaintiff in error made to the sheriff and others that on Saturday evening, September 9, he bought a quart of wine and a pint of whisky, which he drank on Sunday, except one drink of whisky which he gave to his wife; that Monday morning he left home after breakfast and went to Dittle's saloon and had two drinks of whisky and bought two bottles of whisky, one of which bottles was a coca-cola bottle; that he drank one bottle of whisky before he got home and took the other bottle and went to the shed and drank that, and that from then on he didn't know what happened. There is, however, no evidence of the truth of any of these statements, and there is no substantive evidence that he was intoxicated at the time of the killing. Persons called as witnesses on behalf of the State who saw him and talked with him on Sunday noticed nothing unusual in his speech or conduct, while two witnesses called on behalf of the State, who had sold him coca-cola Monday morning during the time when he was away from his home, noticed nothing peculiar in his speech or behavior. Five witnesses who saw him in the yard and at the shed just prior to the killing noticed nothing different in his manner from ordinary, except that some of the witnesses said he looked kind of desperate. He did not stagger nor was he incoherent in his speech. There were none of the usual indicia of intoxication shown by the evidence. Shortly after he had shot his wife, during the siege, one of the besieging party was behind a tree about eighteen inches in diameter, and Cochran fired his revolver at him and only missed the tree four times out of thirty shots. Several lay witnesses who had worked with Cochran, and others who had seen him on other occasions, including the two who had sold him coca-cola on the morning in question, and officers in whose custody he had since been, stated that in their opinion, based

on their observation and conversations with him, he was sane. Two alienists, called as experts by the State, with whom Cochran had refused to talk when they interviewed him in the jail, usurped the functions of the jury and testified that they had heard all the evidence in the case, both oral and documentary, and that in their opinion, based on such evidence, on September 10, at the time he shot his wife, he was sane; that he knew the difference between right and wrong, and that he did then have the power to either do or not to do the shooting. On the other hand, the defense introduced the record of the county court of Tulsa county, Oklahoma, which showed that on May 10, 1920, on an inquest in that court Cochran was adjudged insane and on May 11 was committed to the Eastern Oklahoma State Hospital for the Insane. The record of the proceedings in that case shows that the first symptom of insanity was manifested in 1918 by peculiar conduct; that the first real outbreak was in February, 1920; that the disease was increasing, with variable periods; that the derangement was manifested by delusions of persecution; that he had shown symptoms of attempts to injure others and gave fight to the officers; that he muttered to himself and said that they could not kill him; that he imagined people persecuted him. The defense also introduced in evidence a transcript of the records of the county court of Wichita county, Texas, showing that Cochran was adjudged insane on September 20, 1921. This transcript also shows that at that time he was suffering from delusions that the Masonic lodge had put up $1000 reward for his body and that persons were framing up on him and threatening to take his life; that he accused his friends of being in the conspiracy, and said that he was going to kill them first, before they got him. While the transcripts of the final orders adjudging him insane were competent evidence, we are of the opinion that the recitals of fact as to his symptoms and as to the cause and progress of his disease were not competent

evidence as to the existence of such facts. Dr. N. M. Walker, under whose treatment Cochran was for four months after September 10, 1921, at the State hospital for the insane at Wichita Falls, Texas, testified that he examined Cochran on September 10, 1921, and several times afterwards while he was under his care; that Cochran was then suffering from circular insanity; that when he first saw him he showed symptoms of paranoia,—symptoms of delusions and persecutions; that he went out of that stage soon after he was placed in jail and developed melancholia, and at times he had maniacal outbursts, which completed the cycle; that he then had delusions of persecution by the Masonic lodge, and that said lodge was offering large sums of money for his body and that several men were plotting to take his life; that he did not have delirium tremens; that he never found any evidence of alcoholism; that the delusions which he had could never be superinduced by alcohol; that he saw no form of alcoholism and found no history of such alcoholism. Two other alienists called by the defense testified that they had made examinations of Cochran and found that he was suffering from a mental disease known as paranoia; that he had delusions that he had been pursued by Masons for many years; that his wife had become associated with and was an agent of the Masons; that paranoia is generally a hereditary disease; that where paranoia once exists it is a continuous and progressive disease of the mind and that there are no lucid intervals; that a paranoiac can discriminate in a great many things; that he can carry on a business successfully and still have the idea of persecution; that where a true paranoiac type of insane person is not touched on his delusional field he will present the appearance of a person in normal mental health; that a paranoiac would not be affected as to marksmanship with fire-arms; that in their opinion on the 10th day of September, 1923, Cochran did not have the power to discriminate between right and wrong

nor the ability to will or act in connection with his delusional field; that they found no evidence of chronic alcoholism.

We have not attempted to set forth the evidence fully upon this point but only sufficiently to show the evidence was sharply conflicting and that there was substantial evidence in the case upon which to base a defense as against the charge of murder. In this conflicting state of the evidence it was essential that the jury be accurately instructed as to the law and that the record be free from prejudicial error. At the request of the State the court gave to the jury an instruction as follows:

"The court instructs the jury as a matter of law, that the law presumes every man to be sane until the contrary is shown; and when insanity is set up as a defense by a person accused of crime, then, before the jury can legally acquit the accused of said crime on the ground of insanity, it must appear, from the evidence in the case, that at the time of the alleged crime, the accused was not of sound mind, but affected with insanity to such a degree as to deprive the accused of the mental power to know right from wrong concerning the particular act or acts constituting such crime; and also the mental power of choosing either to do or not to do said acts; or such insanity must be of such a degree as to create in the mind of the accused an irresistible impulse to do said act or acts."

This instruction does not state the law correctly. It casts the burden of proving insanity upon the accused, which the law does not require him to assume. The presumption of sanity is not evidence of sanity and cannot be treated as evidence by a jury in reaching a verdict. (*Guardian Mutual Life Ins. Co.* v. *Hogan,* 80 Ill. 36.) It cannot be weighed in the scale against evidence. (*Lincoln* v. *French,* 105 U. S. 614; *Peters* v. *Lohr,* 35 S. Dak. 372; *Shoemaker* v. *Johnson,* 200 Mo. App. 209.) Its only effect is to throw upon the party claiming insanity the duty of producing some evidence tending to show such insanity. It does not shift

the burden of proof,—meaning the obligation to sustain the truth of the claim of sanity, beyond a reasonable doubt, by evidence,—which rests upon the State throughout the trial. *Helbig* v. *Citizen's Ins. Co.* 234 Ill. 251; *Sielbeck* v. *Grothman*, 248 id. 435; *Johnson* v. *Pendergast*, 308 id. 255.

While the law presumes that all men are sane, in a criminal case, whenever there is evidence introduced tending to show that the accused was insane at the time of committing the act constituting the alleged crime, the burden then devolves upon the State, regardless of the presumption, to prove, beyond a reasonable doubt, by evidence, that at the time of the commission of such act the accused had sufficient mentality to distinguish between right and wrong as to that particular act, and that he was capable of exercising the power to choose between the right and the wrong, and if the evidence fails to show both such facts beyond a reasonable doubt it is the duty of the jury to acquit the defendant. (*People* v. *Lowhone*, 292 Ill. 32.) An instruction to the jury as to what the presumption of law is, upon a question of disputed fact, is extremely likely to mislead the jury and should not be given. *Guardian Mutual Life Ins. Co.* v. *Hogan, supra; Garrettson* v. *Pegg*, 64 Ill. 111.

The court, at the request of the State's attorney, also gave to the jury the following instruction:

"The court instructs the jury that in order to find the defendant not guilty on the ground of insanity, such insanity must be so clearly proven as to raise a reasonable and well-founded doubt of the defendant's guilt when the whole evidence is taken together, and not a mere shadow or possibility of a doubt."

This instruction is inherently inconsistent and casts the burden of proof upon plaintiff in error instead of upon the State, where it properly rests. *Dacey* v. *People*, 116 Ill. 555; *People* v. *Penman*, 271 id. 82; *People* v. *Davis*, 300 id. 226.

It is claimed by the defense that Cochran was a paranoiac. The county physician of St. Clair county and the

physician who took care of Mrs. Cochran during her confinement were called as witnesses by the State to testify as to their opinions as to Cochran's sanity, based on observation and conversation with him. On cross-examination counsel for the defense asked each one of them if he knew anything about the disease known as true paranoia, whereupon the State's attorney objected on the ground that these physicians had not been called as experts but only as lay witnesses, and the objection was sustained by the court. When a physician is called as a witness he becomes the same as any other witness, and is sworn, the same as any other witness, to tell the whole truth within his knowledge as to the subject with reference to which he is interrogated, and counsel for the defendant had a right, on cross-examination, to ascertain the full extent of the knowledge of these witnesses upon the subject concerning which they were testifying.

On September 15, 1923, Cochran was taken before the grand jury, and while ostensibly sworn as a witness against the person from whom he is alleged to have purchased intoxicating liquor shortly prior to the shooting, he was interrogated and gave testimony upon the vital point in this case,—i. e., his mental condition at the time of the shooting. An assistant State's attorney who had charge of the grand jury which returned the indictment against Cochran, over objection was allowed to testify on the trial of this case as to Cochran's testimony before the grand jury. Among other things, the assistant State's attorney testified that Cochran had testified before the grand jury that the statements contained in a paper signed by him and read over to him before the grand jury were true, and this paper, bearing Cochran's signature, was introduced in evidence in this case and contained the following statements: "Last Saturday evening I went to Dittle's saloon, on East Main street, and bought a quart of grape wine, for which I paid $1.25, and a pint of moonshine whisky, for which I paid $6,

and paid this money to Walter Dittle. I went home and put the bottle of wine on the stove and hid the whisky in the toilet house. I think my wife took one drink of the whisky and I drank the rest of the whisky and the wine. I drank that during Sunday. I got up Monday morning and was going to go to work but felt too bad from the drinking the night before, but came up-town. I got a package of cigarettes at the National Hotel bar and walked on the south side of Main street east till I got to Dittle's and went in and got two or three drinks of whisky, for which I paid for each drink twenty-five cents. After I drank the two or three drinks of whisky I bought two bottles of moonshine whisky, for which I paid one dollar for each bottle. One bottle was a coca-cola bottle, and I don't remember what kind of bottle the other was, but I know the one was a coca-cola bottle. I drank one bottle before I got home, and walked past the Modern Garage and north on Walnut street. I got back to the house about 7:30 or 8:00 o'clock. I later went into the toilet house and drank the other bottle of whisky, and the last that I remember is that I was sitting on the seat in the toilet and took the last drink out of the bottle."

While Cochran was informed, when before the grand jury, that if he did not desire to testify he did not have to, and that his testimony might be used for any lawful purpose, he was not fully informed as to all of his legal rights, and the assistant State's attorney admitted, on cross-examination, that Cochran was there told that he would not be asked anything connected with the shooting of his wife and mother-in-law. The State's attorney in his official capacity is the representative of all the people, including the defendant, and it was as much his duty to safeguard the constitutional rights of the defendant as those of any other citizen. Taking Cochran before the grand jury, and, under guise of examining him as to the guilt of someone else, procuring from him statements having a bearing upon the

vital question in his case and then using them as evidence
against him upon the trial of his case, was a violation not
only of the promise given him while before the grand jury
but was a violation of his constitutional rights.

For the errors indicated the judgment of the circuit
court will be reversed and the cause remanded to the cir-
cuit court of Washington county.

*Reversed and remanded.*

Mr. JUSTICE FARMER, dissenting.

---

(No. 16023.—Reversed in part and affirmed in part.)
METHA ENGLER, Defendant in Error, *vs.* EDWARD ENGLER,
Plaintiff in Error.

*Opinion filed October 28, 1924.*

1. FREEHOLD—*a suit to have part of real estate assigned as ali-
mony involves freehold.* A court of equity may assign as alimony
to the wife a part or all of the real estate of the husband in fee,
and a bill filed for such purpose involves a freehold, and an appeal
from a decree dismissing such bill for want of equity should be
taken directly to the Supreme Court.

2. DIVORCE—*taking case to the Appellate Court waives right to
claim real estate as alimony.* Where a bill for divorce and praying
an assignment of real estate as alimony is dismissed for want of
equity, the complainant, desiring to question the court's action in
denying the relief with respect to the real estate, should appeal
directly to the Supreme Court, and the right to raise such question
is waived by taking the case to the Appellate Court on assignments
of error on the question of granting the divorce.

3. PRACTICE—*Appellate Court cannot direct transfer of real es-
tate as alimony.* On appeal to the Appellate Court from a decree
dismissing a bill for divorce and alimony, the Appellate Court, on
reversing the decree, may direct the entry of a divorce but cannot
order the transfer of real estate as alimony.

WRIT OF ERROR to the First Division of the Appellate
Court for the First District;—heard in that court on appeal
from the Superior Court of Cook county; the Hon. TIMO-
THY D. HURLEY, Judge, presiding.