THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN MASK, Defendant-Appellant.

(No. 74-302;

Fifth District—December 19, 1975.

G. MORAN, J., dissenting.

Stephen P. Hurley and Ann L. Carr, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Bruce D. Irish and Rolf F. Ehrmann, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court: ·

This cause is an appeal by the defendant, John Mask, from a judgment of conviction for the crime of armed robbery entered by the Circuit Court for the Twentieth Judicial Circuit, St. Clair County, Illinois, pursuant to a jury verdict of guilty. More particularly, the defendant is appealing from the trial court's ruling granting the State's attorney's motion to strike the defendant's affirmative defense of insanity at the close of all the evidence, and the trial court's concomitant decision not to tender any instructions as to an insanity defense. The defendant also appeals from the trial court's sentence of 4 to 12 years' imprisonment and its denial of defendant's request for a sentence incorporating a work release plan. An understanding of the evidence is essential to the determination of this appeal.

The evidence is uncontradicted that in the early morning hours of January 12, 1972, the defendant entered a certain restaurant and tavern in Cahokia, Illinois, pulled a gun, stating "This is a holdup," seized money from the bartender, seized a woman patron around the neck, and while pointing the gun at her head, stated that she was going with him or he was going to "blow her brains out." The defendant then left the restaurant and tavern, entered a parked automobile with the hostage and two other codefendants, and proceeded to attempt an escape from the scene, while being pursued by the police, at speeds in excess of 100 miles per hour. During this chase the defendant again threatened to blow the hostage's brains out, suggested that the hostage should be thrown from the speeding auto, and made sexual advances towards the hostage. The defendant also threatened to kill the codefendant driving the automobile if he stopped for the police car pursuing them. The chase ended when the automobile in which the defendant and the others were riding collided with a light pole. The money and the gun were subsequently found in the vicinity of the collision scene. It is also uncontradicted that the defendant was drinking alcoholic beverages heavily for several hours preceding these enumerated events, and that he was considerably intoxicated by the time he entered the restaurant.

On January 13, 1972, while the defendant was in the custody of the Cahokia police, the defendant made a voluntary statement, after being fully advised of his legal rights, in his own words, less specific than the facts as above set forth but substantially the same and in no way contradictory.

On January 29, 1972, the defendant filed a motion for a mental examination pursuant to section 104—2(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1971, ch. 38, par. 104—2(d)). This examination was subsequently ordered by the trial court and the defendant was

examined by a psychiatrist, Dr. Frank M. Perez. Dr. Perez filed a psychiatric evaluation with the trial court that found, in pertinent part, that the defendant's intelligence was at the level of "dull normal," that the defendant had "difficulty in functioning socially," and that:

> "This defendant is, at present, competent and able to examine, without any difficulty, the events described. He knows the nature of the charges; he is able to assist counsel with the preparation of his defense."

The report does not contain any opinion with regard to the defendant's mental state at the time of the criminal conduct on January 12, 1972. On April 11, 1973, the defendant filed a motion for further psychiatric examination, which motion was denied. The defendant makes no objection to these two proceedings on this appeal.

At the trial of this cause the facts as above delineated were produced, and, in addition, the defendant testified in pertinent part that while he remembered entering the restaurant-tavern with the gun in his pocket, ordering a beer and taking a drink, thereafter he could not remember anything else until he was climbing into the car with the woman. The defendant also testified that he remembered the auto collision and being taken to the police station, but nothing thereafter until he awoke in a cell. He further testified he could not remember writing the statement, although he acknowledged the statement was in his handwriting.

The defendant's father testified at trial that the defendant's conduct when drinking substantial quantities of alcoholic beverages was, in his experience, antagonistic, and that, on one occasion, it was his opinion that the defendant's behavior was "more than simple drunkenness."

The defendant also called a psychiatrist, Dr. Juan C. Corvalan, to testify as to the defendant's mental condition. Dr. Corvalan examined the defendant for approximately 1½ hours on October 5, 1973. He also had examined the police reports concerning the commission of this crime, the psychiatric report of Dr. Perez, and a hospital report on the defendant. The pertinent questions of defense counsel and the replies of Dr. Corvalan were as follows:

> "Q. After you had opportunity to do that you conducted your examination, Doctor? Did you draw some conclusions, first, as to his intelligence?
>
> A. Yes, sir, examination of his mental functioning, I gave him a test—IQ test, which was a kind of intelligence test I gave. It was borderline or defective stage.
>
> Q. Now, in addition to that, did you form a diagnostic impression?
>
> A. Yes, sir, my diagnostic impression was first from the record

of excessive drinking, there is alcoholism, that means that the patient is suffering from a disease called Alcoholism in this particular moment. It is one of the stages.

The other point was borderline mental retardation versus adult normal—the other possibility in the diagnosis was inadequate personality; fourth was organic disorder has to be ruled out.

Q. By that what do you mean?

A. It meant that the information that I have, it wasn't enough for me to make a final diagnosis in regard to this organicity—not to be neurological work up—he has to be able to find out—to be able to classify this mental retardation to his abnormal behavior * * *."

Defense counsel then proceeded to ask a hypothetical question containing a history of the defendant from his adolescent years through the events of January 12, 1972, when the defendant was 20 years of age. Defense counsel concluded the hypothetical question, and Dr. Corvalan answered as follows:

"* * * Assuming all these facts to be true, Doctor, do you have an opinion, to a reasonable degree of psychiatric certainty, whether at the time of said conduct as a result of mental disease or mental defect the hypothetical individual lacked substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law?

A. Yes.

Q. What is that opinion?

A. I feel that this person is unable any way to conform his conduct to the requirements of the law."

On cross-examination the State's attorney asked, and Dr. Corvalan answered, in pertinent part:

"Q. So, now, when you get down to your diagnostic impressions you have organic disorder that you are talking about; you have it ruled out; you have inadequate personality; you have that ruled out?

A. Yes.

Q. I am assuming these are ruled out from you—

A. No, I am sorry—this is the problem—I am sorry—your terminology—when we give our diagnosis—diagnostic impression —we would not rule out further studies—it doesn't mean you don't consider that possibility.

Q. What I am saying you didn't consider it, because you didn't have enough examination?

A. No, I did consider it; it is needed to have further studies,

because you see, in this case, he has a borderline mental retardation; he is very susceptible to high dosages of alcohol and the behavior is really violent, so in a way you have to see why it is happening—to rule out epilepsy—it should be done  *  *  *.

&ast; &ast; &ast;

Q. One last question to summarize; are you saying that you made this conclusion—is that to depreciate the criminality of his conduct—or to conform his conduct to the requirements of the law? Are you saying it is alcohol that is causing this, along with the low retardation, at the particular time he is under stress?

A. We are saying that the assumption we normally assign, that is stress, and this mental retardation, borderline retardation, plus alcohol.

Q. Remove the alcohol completely—

A. Still there is organic pathology with the brain there.

Q. But would you reach the same conclusion—

A. Without—

Q. Without alcohol, without a history of alcohol?

A. With the same history I have here?

Q. Right.

A. With the exactly same history, without alcohol—but using alcohol in the minimum or using alcohol all the life?

Q. We are saying, remove alcohol entirely from this history?

A. Completely?

Q. Completely.

A. Still I have my questions about his abilities to control his behavior.

Q. You have questions, I am sure, but would you reach the same conclusion?

A. I couldn't answer that, no, sir.

Q. Right.

A. I don't know whether I am confused about the information or history of the patient—

Q. All right.

A. With the patient, let's say—alcoholic in all his life since age thirteen, is a very important factor; I feel that my impression was there—

Q. What I am saying, remove excessive alcoholism which may have occurred on the night this crime happened—had there been no drinking at all, would you have been able to reach the same conclusion?

A. I don't know, sir."

Section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 6—2) states:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

The evidentiary burden of going forward with proof to raise this defense, and by raising it require its submission to an appropriately instructed jury for consideration, is a matter clearly enunciated by the Illinois Supreme Court, most recently in *People v. Redmond*, 59 Ill.2d 328, 320 N.E.2d 321. There the Supreme Court construed section 3—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 3—2(a)), which provides in pertinent part:

"[U]nless the State's evidence raises the issue involving the alleged (affirmative) defense, the defendant * * * must present some evidence thereon."

The Supreme Court held at pages 337-38:

"Defendant maintains that the question as to the quantum of proof necessary to raise the affirmative defense of insanity is easily ascertainable from the clear and unambiguous statutory language which merely requires that 'some evidence' of insanity be introduced thereby placing the burden upon the State to rebut the defense by proof beyond a reasonable doubt. This position is in contradistinction to our recent decision in *People v. Smothers*, 55 Ill.2d 172.

\* \* \*

\* \* \* Since the enactment of the Criminal Code in 1961, it has been held that a reasonable doubt of a defendant's sanity must be presented to rebut the presumption [of sanity] and require the State to introduce evidence to prove an accused sane, and the legislature has not effected a modification of this construction. We therefore must reject defendant's contention relating to his evidentiary burden in establishing an affirmative defense of insanity." (59 Ill.2d 328, 337-38.)

The first question to be addressed on this appeal is, therefore, did the defendant's evidence raise a reasonable doubt of defendant's sanity at

the time of the commission of the criminal acts. After a close consideration of the record we conclude that it did not.

Defendant's conduct was no more bizarre and irrational than that of the defendants in *People v. Smothers,* 55 Ill.2d 172, or *People v. Redmond,* 59 Ill.2d 328. In fact, the only significant difference in the quantum of evidence on this point in this case, as opposed to that in *People v. Redmond* and *People v. Smothers,* is the testimony of the psychiatrist, Dr. Corvalan, for the defendant. From Dr. Corvalan's testimony, as above noted, two points are clear.

The doctor's opinion of the defendant's sanity at the time of the commission of the criminal acts is extremely ambiguous. He first states that while, in his opinion, the defendant is suffering from alcoholism in one of its intermediate stages, low intelligence and inadequate personality, the defendant is not suffering from any organic disorder of the mind. He then testified that he lacked sufficient information to make a diagnosis as to the cause of the defendant's abnormal (criminal) behavior. This statement we can readily accept as the doctor examined the defendant for less than an hour and one-half. He then answers defense counsel's hypothetical question to the effect that the defendant is incapable of conforming his conduct to the requirements of law. Subsequently on cross-examination, the doctor first testifies that neither the defendant's inadequate personality nor any organic disorder of the mind caused his conduct. He then testifies that he had inadequate studies and information to give an opinion. He next states that the defendant, in fact, has "organic pathology with the brain," but concludes by being unable to opine that the defendant would have been unable to conform his conduct to the requirements of law had he not been intoxicated. This testimony is so ambiguous and obtuse that it sheds no light on the defendant's ability to have conformed his conduct to the requirements of law.

■■ The second problem with the doctor's testimony, even assuming *ad arguendo* that a reasonable doubt was raised as to the defendant's ability to conform his conduct to the requirements of law, is that he could give no firm opinion as to the nature or existence of a specific mental disease or mental defect resulting in the defendant's inability to conform his actions to the law's requirements. (*People v. Rivera,* 7 Ill. App.3d 983, 987, 289 N.E.2d 36; *People v. McBride,* 130 Ill.App.2d 201, 207, 264 N.E.2d 446.) The only elements which the doctor unequivocally cited as the cause of the defendant's conduct were borderline intelligence and alcoholism. Low intelligence is certainly not a mental disease or mental defect within the meaning of the statute, nor does the defendant suggest otherwise on this appeal. The contention of the defendant on this appeal that the evidence herein gives rise to the defense of insanity by

reason of intoxication is without-merit. The cases require that such alcoholism be of long duration and have resulted in a permanent mental disease. (*People v. Bray*, 52 Ill.App.2d 384, 387-88, 202 N.E.2d 152; *People v. Cochran*, 313 Ill. 508, 518, 145 N.E. 207.) The evidence herein fails to show any permanent mental defect, particularly in light of the defendant's father's testimony that the defendant was a good worker and obedient son when he did not drink. In regard to the point concerning intoxication, we lastly note, as did the appellate court in *People v. Bray*, at pages 389-90, that:

> "The defendant cannot rely on the defense of voluntary intoxication at the time of the crime. People v. Lion, 10 Ill.2d 208, 139 N.E.2d 757. Our courts have consistently held that this defense may be used only in cases in which the crime involves a specific intent or malice. People v. Bartz, 342 Ill. 56, 173 N.E. 779; People v. Cochran, 313 Ill. 508, 145 N.E.2d 207. No such specific intent or malice is required for armed robbery. Ill. Rev. Stats. (1963), sections 18—1 and 18—2; People v. Emerling, 341 Ill. 424, 173 N.E. 474."

In light of the fact that we affirm the trial court's decision to strike the defendant's affirmative defense of insanity, we necessarily affirm the trial court's refusal to give those jury instructions of the defendant relating to an affirmative defense of insanity.

■■ We next turn to the question of the trial court's denial of the defendant's request for a sentence of periodic imprisonment. The defendant on this appeal correctly notes that a sentence of periodic imprisonment was one authorized disposition of this defendant's conviction of armed robbery when the trial court imposed its sentence. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—5—3, as amended by Public Act 78—832; *People v. Robinson*, 20 Ill.App.3d 152, 156, 313 N.E.2d 213.) However, it has long been the rule in Illinois that the imposition of a sentence is a matter particularly within the discretion of the trial court (*People v. Bonner*, 37 Ill.2d 553, 563, 229 N.E.2d 527, *cert. denied*, 392 U.S. 910, 20 L.Ed.2d 1368, 88 S.Ct. 2067), and, further, that, absent a showing in the record that the sentence imposed is a manifest abuse of the trial court's discretion, a reviewing court will not interefere with the sentence pronounced (*People v. Bonner*; *People v. Smith*, 14 Ill.2d 95, 150 N.E.2d 815; *People v. Robinson*, 116 Ill.App.2d 323, 324-25, 253 N.E.2d 570). As was held in *People v. Latson*, 5 Ill.App.3d 1100, 1104-05, 284 N.E.2d 436:

> "The power to reduce the punishment imposed by the trial court should be exercised with caution, and this court will not reduce a sentence unless it clearly appears the punishment is a departure from fundamental law, its spirit and purpose, or that the penalty

is not proportioned to the nature of the offense. (*People v. Taylor* (1965), 33 Ill.2d 417; *People v. Ramsey* (1969), 115 Ill.App.2d 431.) The sentence rendered in this case is well within the statutory limitation and does not violate the standards set forth above." See also for this same proposition *People v. Grau*, 29 Ill.App.3d 327, 329-30, 330 N.E.2d 530.

In this case we have closely reviewed the record, and, noting the violence and disregard of life and property exhibited by the defendant in this crime, as well as the fact that the trial court's sentence was well within the limits set by statute, we cannot find either an abuse of discretion or a departure from the fundamental spirit and purpose of the law.

Affirmed.

KARNS, P. J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

In my opinion the trial court erred in granting the State's motion to strike the defendant's affirmative defense of insanity at the close of all the evidence. The evidence revealed that the defendant suffered from severe head injuries, a long history of adjustment problems and an inability to deal with stress. The defendant's father told of a prior instance when the defendant's conduct was irrational and uncontrollable. The only expert witness said that at the time of the crime the defendant was unable in any way to conform his conduct to the requirements of the law. Defendant's conduct during the commission of the crime was irrational.

There was a sufficient evidentiary basis for a jury to find the defendant insane at the time of the commission of the crime in question and therefore the trial court erred in removing this issue from the jury's consideration. I would reverse and remand for a new trial.